We find no confusion in the jurisprudence of this state on the question of burden of proof.

The language of the court in the cases cited is emphatic, clear, and unambiguous, to the effect that in all cases where the evidence shows that the insured killed himself, but leaves it doubtful whether he did so intentionally or accidentally, the presumption of accident will prevail.

Judgment affirmed.

---

(110 So. 188)

No. 27684.

## STATE v. THRIFT OIL & GAS CO.

(March 29, 1926. On Rehearing, Oct. 5, 1926.)

*(Syllabus by Editorial Staff.)*

### On Rehearing.

**1. Statutes ⬤⟳109.**

Index to contents of statute in title thereof is not necessary to its validity.

**2. Mines and minerals ⬤⟳86.**

Act No. 252 of 1924, for conserving of natural gas resources, *held* not to place additional restrictions on wells drilled before passage of act, but to secure to them protection of Act No. 91 of 1922, in addition to its own provisions.

**3. Constitutional law ⬤⟳48.**

Legislature is presumed to have contemplated constitutional rather than unconstitutional statute.

**4. Constitutional law ⬤⟳211.**

Statute favoring already existing establishments is reasonable and constitutional, while statute discriminating against such is unreasonable and unconstitutional.

**5. Mines and minerals ⬤⟳86.**

Act No. 252 of 1924 for conserving natural gas resources *held* to constitute the law regulating amount of gas which may be taken, subject to restriction that well drilled before passage of act may avail of provisions of Act No. 91 of 1922.

**6. Constitutional law ⬤⟳42.**

Constitutionality of statute may not be challenged by one whose rights are not adversely affected by it.

**7. Mines and minerals ⬤⟳95.**

In prosecution for wasting natural gas, refusal to charge that defendant, whose well was drilled before passage of Act 252 of 1924, was entitled to benefits of provision permitting under certain circumstances taking of 1,000,000 cubic feet per day *held* erroneous.

Land, J., dissenting.

Appeal from Third Judicial District Court, Parish of Union; S. D. Pearce, Judge.

The Thrift Oil & Gas Company was convicted for an overdraft of gas, and it appeals. Reversed and remanded for a new trial.

George Gunby, of Monroe, for appellant.

Percy Saint, Atty. Gen., Percy T. Ogden, Asst. Atty. Gen., Wm. J. Hammon, Dist. Atty., of Jonesboro (E. R. Schowalter, of New Orleans, of counsel), for the State.

LAND, J. Defendant company is a Louisiana corporation, with its domicile and principal office in the city of Monroe, La., and is engaged in operating gas wells in the Monroe gas field, which embraces the parishes of Ouachita, Morehouse, and Union, in this state.

On the 20th of November, 1925, defendant corporation was convicted in the Third judicial district court for the parish of Union for an overdraft of gas from its Parks well No. 2, which is located in that parish.

Defendant corporation has appealed from the judgment against it, and relies, for the reversal of the conviction and sentence, upon numerous grounds.

1. The information filed by the district attorney of the Third judicial district charges that defendant, the Thrift Oil & Gas Com-

pany, "during the seven-day period, beginning November 13, 1924, and ending November 20, 1924, with force and arms, etc., did, at its Parks well No. 2, having a maximum flow of gas allowed by law of 4,794,000 cubic feet, willfully, feloniously, and maliciously draw from said well, during the said seven-day period, the sum of 6,551,000 cubic feet, an overdraft of 1,757,000 cubic feet of gas, contrary to the form of the statutes of the state of Louisiana in such cases made and provided, and against the peace and dignity of the same."

Defendant corporation has attacked the constitutionality of Act 91 of 1922 and of Act 252 of 1924. It contends that it is expressly excepted from the operation of the latter act, under the process and provisions of which the conviction has been secured and the penalty has been imposed in this case.

The constitutionality of Act 91 of 1922, "An act to regulate and control the use of natural gas in the manufacture of carbon black, and to prescribe penalties for the violation of this act," is assailed by defendant corporation, on the ground that said act, in granting to the commissioner of conservation, an executive officer, the authority to fix the percentage of consumption of gas, to be used in the manufacture of carbon black, has delegated to a branch of the executive department of the state government the power to enact laws, a legislative function, in violation of sections 1 and 2, art. 2, section 1, art. 5, and section 1, art. 6, of the Constitution of 1921 of this state.

Section 1 of article 6 of the Constitution creates and establishes the department of conservation. Section 1 of article 5, ranks the commissioner of conservation as one of the public officers composing the executive department of the state government. Sections 1 and 2 of article 2 divide the powers of the government of this state into three distinct departments, legislative, executive, and judicial, and provide that:

"No one of these departments, nor any person or collection of persons holding office in one of them, shall exercise power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted."

Section 1 of article 6 of the Constitution of 1921 declares that:

"The natural resources of the state shall be protected, conserved, and replenished; and for that purpose shall be placed under a department of conservation, which is hereby created and established. The department of conservation shall be directed and controlled by a commissioner of conservation to be appointed as elsewhere provided in this Constitution, who shall have and exercise such authority and power as may be prescribed by law. The Legislature shall enact all laws necessary to protect, conserve and replenish the natural resources of the state, and to prohibit and prevent the waste or any wasteful use thereof."

Section 2 of Act 91 of 1922 authorizes, directs, and empowers the commissioner of conservation to fix and determine, on the 1st day of October, 1922, and semiannually thereafter—

"What percentage of consumption of natural gas produced by each gas well may be used in the manufacture of carbon black, said percentage of consumption to be based upon the potential capacity of such gas well, and which percentage shall not be less than fifteen per cent. and not more than twenty per cent. of the potential capacity of such well, provided that in fixing such basis of consumption the same rule, as far as possible, shall be applied to all gas wells in any producing gas area, and provided further, that the percentage of consumption may be increased in any particular well when the safety of such well may demand such increase."

Section 3 of said act provides:

"That the commissioner of conservation is authorized, empowered, directed and required to reduce the consumption of natural gas used in the manufacture of carbon black below the minimum fixed in section 2 of this act, after promulgation for sixty days of an order to that effect, whenever it is actually necessary to do so in obtaining an adequate supply of natural gas for domestic heating and lighting purposes in the state of Louisiana, and for manufacturing plants, industries. and enterprises located

and operated within the state of Louisiana, other than those engaged in the manufacture of carbon black; provided that the conditions set out in this section shall not become effective until such time as the establishment of factories, industrial plants, and enterprises, the construction of pipe lines in the state of Louisiana, and domestic consumers in Louisiana, or any one of such shall provide a demand which necessitates the enforcement of the same."

Section 5 of said act declares:

"That the commissioner of conservation is authorized, empowered, and directed to make, adopt and promulgate orders, rules and regulations, which in his judgment may be necessary for the proper carrying out of the provisions of this act."

Section 6 of said act provides:

"That it shall be the duty of the commissioner of conservation to enforce the provisions of this act and the orders, rules and regulations made, adopted and promulgated by him."

Section 7 declares that:

"It shall be the duty of the department of justice to represent said commissioner in the enforcement of the provisions of this act, and of the orders, rules and regulations made, adopted and promulgated by said commissioner of conservation."

Section 8 provides that it shall be a misdemeanor for any person, partnership, firm, corporation, or association of persons to violate any of the provisions of this act, or any rule, regulation, or order of the commissioner of conservation prescribed by authority of this act, and fixes the fine at not less than $100 nor more than $500, makes daily violations of this section separate offenses, and for the third conviction subjects the offender to the forfeiture of the right to manufacture natural gas into carbon black, at the suit of the commissioner of conservation.

Does Act 91 of 1922 delegate to the commissioner of conservation the exercise of legislative functions by conferring upon him the authority to fix the percentage of gas to be used in the manufacture of carbon black? The members of the Legislature were advised of the fact that it was necessary to test and regauge gas wells every six months, in order to ascertain their potential capacity. Such wells, in the very nature of things, fall off in production after months of constant activity.

Is the General Assembly of this state to be called into extra session every six months? Are special committees to be appointed at these semiannual sessions to test and regauge every gas well in the state? Are such committees to make a report to the committee on the whole as to whether the percentage of the potential capacity of each gas well should be increased or diminished? And, then, is a special act to be passed to continue in force the percentage of consumption from each gas well for the next six months?

Constitutions and laws are intended to be practical and sensible. They cannot well be impossible; nor should they be construed to defeat their evident purpose and intent.

The framers of the present Constitution were well aware of the fact that the commissioner of conservation is an officer in the executive branch of the state government. They were fully cognizant of the limitations placed upon each department of the state government by the organic law; yet, in face of all this, it is ordained that "the natural resources of the state shall be protected, conserved and replenished," and "the Legislature shall enact all laws necessary to protect, conserve and replenish the natural resources of the state, and to prohibit and prevent waste or any wasteful use thereof."

The Legislature has been careful not to leave the fixing of the percentage of gas to be used from wells to the mere arbitrary discretion of the commissioner of conservation.

The limits of the percentage have been established by the Legislature itself, in section 2 of Act 91 of 1922, at not less than 15 nor more than 20 per cent., as a general rule to guide the commissioner under ordinary circumstances.

Defendant company today is receiving the maximum limit of 20 per cent.

Every condition under which this percentage may be increased or diminished has been specifically prescribed in sections 2 and 3 of that act, and it has been expressly provided, in order to prevent discrimination, that:

"In fixing such basis of consumption, the same rule, as far as possible, shall be applied to all gas wells in any producing gas area."

In determining the minimum and maximum limits of the percentage of gas to be used, the Legislature realized that producing wells gradually change in flow and condition, and that it was impossible, therefore, for the state to prescribe any fixed rule as a basis for a fixed percentage of the gas to be consumed.

The acts which must be performed in the conservation of the oil and gas of the state, in order to protect these natural resources against waste and wasteful use, are multitudinous.

It is not possible for the state itself to be present at each time the open flow capacity of a well is tested, in order to ascertain whether the percentage of the gas to be taken should be increased or decreased, according to the condition of the well or its production. Should the state attempt to exercise such authority, the whole time of the Legislature would be thus consumed; its acts would be endless; the thing would be utterly impracticable.

Oil or gas in the common reservoir is not susceptible of private ownership, but falls within the domain of the natural resources of the state, until severed from the soil and reduced to possession in accordance with the conservation laws of the state and the rules and regulations of the department of conservation. Frost-Johnson Lumber Co. v. Salling's Heirs, 150 La. 756, 91 So. 207.

The right of the state to protect, conserve, and replenish its natural resources is derived from the ownership of such resources.

In exercising its authority in the conservation of its natural resources, the state is not dealing with the property of private individuals, nor attempting to regulate the owner's use of private property, but is acting directly with reference to the administration of property held by it under its sovereignty.

The owner of the soil is powerless to exploit beneath its surface for minerals in such manner as he may will. He must take of those natural resources, if at all, only in the way and to the extent and under the conditions prescribed by the sovereign.

He may not drill a well for gas, except under a permit from the department of conservation, and in the manner prescribed by conservation acts and the rules and regulations of the conservation department. Act 252 of 1924.

The state's ownership of oil and gas and forests cannot be severed from the soil, except by the permission of the state, and only then upon the payment of a royalty or excise tax for the privilege. Gulf Refining Co. v. McFarland, 154 La. 251, 97 So. 433; article 10, § 21, Const. 1921; Act 140 of 1922.

The case at bar is therefore analogous to the cases of United States v. Grimaud et al., 220 U. S. 506, 31 S. Ct. 480, 55 L. Ed. 563, and Fred Light v. United States, 220 U. S. 523, 31 S. Ct. 485, 55 L. Ed. 570.

The act complained of in the Grimaud Case was a departmental regulation of the secretary of agriculture forbidding stock grazing on a forest reservation without a permit from the department, and providing a penalty.

In passing on this question, the Supreme Court of the United States said:

"In refusing permits to use a forest reservation for stock grazing, except upon stated terms or in stated ways, *the secretary of agriculture merely asserts and enforces the proprietary rights of the United States over land which it owns.* The regulation of the Secretary, therefore, is not an exercise of legislative, or even of administrative, power; *but is an ordinary and legitimate refusal of the landowner's authorized agent to allow persons hav-*

*ing no right in the land to use it as they will.*"
(Italics ours.)

In the Grimaud Case, the court held that:

"Legislative power was not unconstitutionally delegated to the secretary of agriculture by the provisions of the forest reserve acts of June 4, 1897, * * * making criminal the violation of the rules and regulations covering forest reservations, made and promulgated by him under authority of those statutes."

A corporation may use the natural resources owned by the state for manufacturing purposes, it is true, but such right is a mere privilege granted by the state, which may be revoked for repeated violations of the conservation acts or of the rules and regulations of the department of conservation. Act 252, 1924, § 8; Act 91, 1922, § 8.

It is clear, therefore, that when the commissioner of conservation fixes the percentage of the gas to be taken from each well in the manufacture of carbon black, he is merely exercising the proprietary rights of the state in its natural resources by limiting the use of such resources to the end that they may be conserved.

The delegation by Act 91 of 1922 to the commissioner of conservation of such authority, as a restriction upon the use of natural gas by carbon black industries is not, therefore, unconstitutional, as, manifestly, it is not the exercise of a legislative function by the state's agent.

The case of State v. Billot, 154 La. 402, 97 So. 589, relied upon by defendant, is in direct conflict with the views of the Supreme Court of the United States as expressed in the Grimaud and Light Cases.

The Billot Case holds that Act 204 of 1912, § 4, permitting the conservation commission to fix the open season during which wild deer may be killed and to vary it to suit conditions in various parishes, grants legislative power to the commission, a branch of the executive department, and therefore violates article 2, §§ 1 and 2, and article 6, § 1, of the Constitu-

tion of 1921. Act 204 of 1912 is an "act to conserve the natural resources of the state of Louisiana, including the natural wild life on land and in the waters of the state," etc.

Section 1 of said act expressly declares:

"That the ownership and title to all fish, birds, and wild quadrupeds found in the state of Louisiana, or in the waters under the jurisdiction of the state not held by private ownership legally acquired, is hereby declared to be in the state."

It follows, therefore, that the state, in vesting the conservation commission with authority to fix the open season during which wild deer may be killed in the various parishes of the state, was dealing directly with the administration of its own property, unaffected by any private right or interest therein. It was the assertion and enforcement by the state through its authorized agent of rights purely proprietary, and not the exercise by such agent of any legislative function or power.

Animals feræ naturæ belong to no one. R. C. C. arts. 3412, 3415.

Game laws do not affect the private ownership of property, or its use. The right of a citizen of this state to take or kill game arises solely from the privilege or license which may be granted to him by the state, which has the authority to protect its natural wild life by prohibiting the taking or killing of birds and animals altogether for fixed periods, as well as by the establishment of closed seasons for that purpose. A citizen may take or kill game only at the times prescribed by the sovereign.

2. Defendant corporation contends that Act 252 of 1924 is unreasonable, discriminatory, and denies to it the equal protection of the law, contrary to the provisions of the Constitution of Louisiana, and of article 1 of the Fourteenth Amendment to the Constitution of the United States, in that section 12 of said Act 252 of 1924 provides a method of prosecuting one class of persons, corporations, dif-

ferent from that applied to all other persons, firms, partnerships, and associations of persons, and in that it provides a method for the prosecution of corporations for the violation of provisions of this act different from that for the violation of all other laws.

Section 12 of Act 252 of 1924 provides that:

"Any corporation violating the provisions of this act, or any order of the commissioner of conservation promulgated by authority of this act, may be prosecuted by indictment, or information, the same as a natural person, and, in addition to and cumulative of any way now existing for bringing a corporation into court in criminal prosecutions, may be brought into court to answer such prosecutions by service of a certified copy of such indictments or information served in the same manner as a civil suit would be served with notice to appear and answer such charge within ten days. In the event of failure to appear and answer such charge within the said ten days judgment by default may be entered as in civil cases, which judgment by default shall constitute a joining of issues and be treated as a plea of not guilty, and on the third day thereafter if no appearance has been made in the meantime evidence may be introduced on the part of the state and the trial judge may render such judgment and sentence as the law and evidence warrant. The amount that such defendants are sentenced to pay may be collected as sentences in other criminal cases, and in addition thereto may be collected in the same manner and same way as judgments in civil cases."

In section 13 of Act 252 of 1924 it is declared that:

"The following definitions and constructions are made a part of and shall be used in construing the meaning and purposes of this act: * * *

" 'Person' means a natural person, a partnership, an association of persons or a corporation."

In declaring, therefore, in section 12 of said act, that "Any corporation violating the provisions of this act, or any order of the commissioner of conservation promulgated by authority of this act, may be prosecuted by indictment or information, the same as a natural person," the Legislature, in view of the definition given of "person" in section 13 of said act, has provided that a corporation may be prosecuted under section 12 of said act "the same as" a partnership, or association of persons, which are expressly included in the definition of "person."

Civil, or additional process, is provided for as to all corporations, firms, and association of persons, as section 10 of Act 252 of 1924 provides that:

"This act shall be cumulative of and in addition to all of the laws of this state which are not in direct conflict with the provisions hereof."

Additional civil process was necessarily provided for in section 12 of said act, as ideal persons can neither be arrested nor can they personally appear in court to plead to an indictment or information.

The laws of the state, prior to the adoption of section 12 of Act 252 of 1924, were inoperative as far as the prosecution of a corporation, or partnership, or association of persons, was concerned because they could not be enforced for lack of proper process compelling the defendant to appear.

It is not an unreasonable classification to provide a different or rather an additional process, as to ideal persons, who can be brought into court effectively only by civil process, in aid of a criminal prosecution.

3. Defendant corporation also attacks section 3 of Act 252 of 1924 as unreasonable, discriminatory, and as denying to it the equal protection of the law, with relation to gas wells referred to in said act and the percentage of gas as established therein which may be drawn from such wells.

Section 3 provides that:

"Where the percentage hereinabove provided applied to any well reduces the amount allowed below one million cubic feet, there may be taken from such well a total of one million cubic feet, provided the back pressure as elsewhere herein provided for, shall be maintained."

Defendant corporation, in attempting to evade the process and penalties provided for

in section 12 of Act 252 of 1924, alleged in its exception to the service and citation herein, that:

"Appearer further shows that the gas well, styled in said bill of information as Parks No. 2, was drilled and completed prior to June 24, 1924, and prior to the passage of Act 252 of 1924; that the provisions of said Act No. 252 of 1924 do not apply to the production of gas from said gas well, in fact, are specially excluded therefrom by the recitals of said act; that the penalties prescribed therein and the mode of procedure thereunder are limited to the violations of the provisions of said Act of 1924; that there is no authority for the procedure taken herein, save for violations of said Act No. 252 of 1924; and that no valid verdict or judgment may be rendered against appearer herein." Tr. 6 and 7.

This plea is not made in the alternative. Defendant corporation stood upon its plea, and went to judgment on it. The trial judge held in his opinion in the case that:

"It is evident to this court that in so far as gas wells drilled prior to June 24, 1924, Act 252 of 1924, provides that the percentage of open flow capacity as fixed in Act 91 of 1922 shall continue as the basis of the owner's right of use, because it is expressly so stated in Act 252 of 1924."

Defendant corporation cannot be permitted to attack section 3 of said act upon the grounds alleged, in total disregard of its pleading, and of the judgment of the lower court, rendered and based upon the same. The opinion of the lower court as to this issue is correct.

4. In defendant's plea of unconstitutionality and motion to quash Act 252 of 1924 is attacked as unconstitutional, null and void for the following reasons:

(a) That said act is violative of article 3, § 16, of the Constitution of 1921 of the state of Louisiana, in that said act has more than one object, and more than one object expressed in its title.

It is contended by defendant's counsel that because Act 252 of 1924 provides a new pro-

cess of court for prosecuting corporations, that this is another and distinct object, in addition to the main object of the act, the conservation of natural gas in the state of Louisiana, the providing for certain rules and regulations governing its use, the making violations thereof a misdemeanor, and the providing for penalties.

The act has but one object indicated in its title, and that is, "To conserve the natural gas resources of the state of Louisiana." The various provisions of the act are germane to that object, including the provision as to the prosecution of corporations, which is merely one of the means intended to carry the object of the act into effect.

"It is hardly worth while repeating what has been said so often, that the constitutional requirement that a statute shall have only one object does not mean that each and every means that may be deemed appropriate for accomplishing the object shall be provided for by a separate act." State v. Lahiff, 144 La. 366, 80 So. 590; State v. Doremus, 137 La. 266, 68 So. 605; City of Shreveport v. Hejin, 140 La. 786, 73 So. 996.

5. It is contended by defendant corporation that Act 252 of 1924, and especially section 12 thereof, is unconstitutional and without effect, as it is a special law relating to the prosecution of corporations for the violation of one criminal statute, and regulating proceedings in a special class of cases, and no notice of the intention to apply therefor was published, as required by article 4, §§ 4 and 6 of the Constitution. This contention is without merit, as Act 252 of 1924 is a statute of general scope, applying to all sections of the state alike, as clearly shown by its title and provisions.

As has already been pointed out, the new provision for the prosecution of corporations, firms, and associations of persons, contained in section 12 of said act, by bringing defendants into court by civil process, is expressly declared to be "in addition to and cumulative of any way now existing for bringing

a corporation into court in criminal prosecutions."

Section 10 of said act declares also that:

"This act shall be cumulative of and in addition to all the laws of this state which are not in direct conflict with the provisions hereof."

It is clear, therefore, that any corporation, firm, or association of persons, for the violation of any criminal statute of this state, may be proceeded against by the service of additional civil process, as provided in section 12 of Act 252 of 1924.

6. The constitutionality of Act 252 of 1924 and especially of sections 2, 3, 4, 5, 6, 8, and 12, are assailed by defendant corporation on the grounds that they contravene the provisions of sections 16, 17, and 18 of article 3 of the Constitution of 1921, in that said act attempts to revise, amend, modify, and alter Act 91 of 1922, without expressing the purpose in the title of said amending act, and without re-enacting and publishing said amended act at length, and, further, in that said act attempts to incorporate the provisions of Act 91 of 1922 therein by general reference only.

Section 16 of article 3 of the Constitution of 1921 declares that:

"Every law enacted by the Legislature shall embrace but one object, and shall have a title indicative of such object."

We have already passed upon this objection adversely to the contention of the defendant.

Section 17 of said article is to the effect that:

"No law shall be revised or amended by reference to its title, but in such cases the act revived, or section as amended, shall be re-enacted and published at length."

Act 252 of 1924 does not attempt to revive or amend any law of this state "by reference to its title." It is the companion act to Act 91 of 1922 and to Act 250 of 1920. All three of these acts relate to the conservation of oil and gas as natural resources of the state.

They are laws in pari materia. They have oneness of purpose; one thing is aimed at; one object is sought. All of these acts are connected with the result sought and are indispensable to the maintenance of the integrity of the conservation system adopted by the state.

There is similarity in some respects between each of these acts, but in other respects Act 252 of 1924 adds to the prior acts, amplifies and supplements both Act 250 of 1920 and Act 91 of 1922, but does not change or amend either in any particular. In the main it adds new authority to the prior law by providing additional duties, methods of prosecutions, penalties, safeguards in the drilling of wells, etc.

Act 252 of 1924 was not written as an amendment of the old laws. It is expressly declared in section 10 of said act that "this act shall be cumulative of and in addition to all the laws of this state which are not in direct conflict with the provisions hereof," and, in section 11, that "the authority given the commissioner of conservation by this act shall in no sense be understood to supersede or nullify any of the provisions of this act, or any other act of this state, but shall be cumulative and in aid thereof."

It is provided in section 12 of Act 252 of 1924 that the "civil process" therein provided in connection with the prosecution of corporations is "in addition to and cumulative of any way now existing for bringing a corporation into court in criminal prosecutions."

The identical issue here involved arose in the case of Dehon v. Lafourche Basin Levee Board, 110 La. 767, 34 So. 770, in which an attack was leveled by the plaintiff in that case against Act 84 of 1902, which was the companion act to Act No. 9 of 1900, on the ground that it amended the latter act without copying it, and that this was a violation of article 32 of the Constitution of 1898, which prohibited an amendment unless the act amended is recited anew in the amending act.

The court said in the Dehon Case:

"Act No. 84 was not written as an amendment of the old law. It is accessory of, and not contrary to, the old law. It contains new and distinct propositions needful, the Legislature must have thought, in carrying out the object in view.

"It would become cumbersome and confusing if, when it becomes necessary by legislation to delegate additional power in order to carry out the old law, it were required to insert, as plaintiffs contend, the whole of the old law in the new act, and publish the old and new law in full.

"We have no idea that such is the intention of article 32 of the Constitution, invoked by plaintiffs in their attack on Act No. 9, p. 8, of 1900, and Act. No. 84, p. 115, of 1902." Pages 774, 775 (34 So. 773).

Section 18 of article 3 of the Constitution of 1921 declares that:

"The Legislature shall never adopt any system or code of laws by general reference to such system or code of laws; but in all cases shall recite at length the several provisions of the laws it may enact."

In State v. De Hart, 109 La. 576, 33 So. 605, in construing article 31 of the Constitution of 1879, similar in its provisions to section 18 of article 3 of the present Constitution, this court said:

"We are inclined to think that the words 'any system or code of laws,' as used in the article, means systems or codes of law other than our own—systems of law, codes of law in vogue in other countries and jurisdictions; that these are not to be adopted by merely a general reference to the same, but that such systems or codes, or the several provisions of the same, wanted to be adopted or enacted here, are to be recited at length in the adopting act."

Act No. 91 of 1922 is an act of this state, and, even if adopted by general reference in section 5 of Act 252 of 1924, the Constitution would not be violated.

7. Defendant corporation contends that section 12 of Act 252 of 1924 is not comprehensive and complete and does not provide in detail and with sufficient clearness the manner and method of prosecuting corporations which may be brought into court to answer for violations of said act.

This section has already been produced in this opinion. It is made sufficiently clear by its provisions that the prosecution is to be initiated by information or indictment, and each step of the civil process which may be taken in bringing the defendant into court, in the joining of issue, in the confirmation of default, and in the execution of the judgment, is in accordance with the Code of Practice of the state, and is sufficiently explicit.

8. Defendant corporation contends that the penalties prescribed and the mode of procedure in the prosecuting of corporations provided by Act 252 of 1924 are limited to violations of its own provisions, and cannot be applied to it, as it is expressly excluded from said act.

We have already discussed the matter of the mode of prosecution, and have held that it is applicable to any corporation violating the provisions of Act 252 of 1924, or those of any other criminal statute of the state. Act 252 of 1924 is, itself, an independent, substantive enactment. It is clearly legislation of a supplemental character. The plain purpose of the act is to provide uniformity of prosecutions and penalties, as well as rules and regulations in the conservation of the natural gas and oil resources of the state of Louisiana, to close all loopholes, to remedy all defects, and to standardize all legislation on this subject.

Act 252 of 1924 covers every phase of conservation of the natural gas resources of the state, and, as the penalty denounced in Act 91 of 1922 is "in direct conflict with" that imposed under Act 252 of 1924, the penalty of the latter act for a third offense being not less than $100 nor more than $10,000, it follows necessarily that the lesser penalty of the former act has been superseded by that of the latter.

The penalty actually imposed upon defendant corporation in this case is no higher than

that provided by Act 91 of 1922. There is but a single exception from the operation of the provisions of Act 252 of 1924, and that relates exclusively to "the percentage of the open-flow capacity of each well," as fixed in section 2 of said act, and also in section 5 as to manufacturers of carbon black. It is provided in Act 252 of 1924, that the percentage, based upon the acreage upon which the well is drilled, and ranging from 24 per cent. to 70 per cent. of the open-flow capacity, according to the size of the tract upon which the well is located, shall not apply to any gas well "heretofore drilled or to a well or wells the drilling of which was commenced on or before June 24, 1924." Section 2, p. 650.

It is also provided that:

"The percentage of the open-flow capacity of gas wells that may be utilized in burning carbon black shall be controlled by this act when the production of such wells is controlled by this act and by Act No. 91 of 1922 when the percentage that such wells may produce is controlled by said Act 91 of 1922." Section 5.

In other words, wells utilized in the manufacture of carbon black are excluded as to the percentage of the open-flow capacity fixed by Act 252 of 1924, if drilled before June 24, 1924, in the same manner that all other gas wells are excluded from the same percentage, if drilled before that date.

All wells, regardless of the use of the gas, if drilled after July 24, 1924, participate alike in the percentage of open-flow capacity fixed in the act. The procedure and penalties of Act 252 of 1924 clearly apply to defendant corporation in the present prosecution.

9. Defendant corporation filed a motion to quash the bill of information in this case on the ground that it does not clearly charge or sufficiently show any offense against defendant, "inasmuch as the production of gas well Parks No. 2 was drilled prior to June 24, 1924, the product of gas therefrom is regulated by the provisions of Act No. 91 of 1922, and that the provisions of said act seek to regulate the percentage of the open-flow ca-

pacity of gas wells which may be drawn therefrom only where the gas so withdrawn is used in the manufacture of carbon black,. and said bill of information does not allege that the gas produced and drawn from the Parks No. 2 well, during the period set forth, was used or intended for use in the manufacture of carbon black."

Section 4, par. 2, of Act 252 of 1924, declares that:

"It shall be unlawful for any person, firm, corporation, or association of persons to take more gas from any well for a period of seven consecutive days than the maximum production allowed to be taken from such well would amount to for the same period."

The information in this case charges defendant corporation with an overdraft from its Parks No. 2 well of 1,757,000 cubic feet of gas "during the seven-day period beginning November 13, 1924, and ending November 20, 1924."

The information, therefore, is clearly drawn under the above provision of Act 252 of 1924.

It is immaterial under this provision whether the gas taken from the well during the period of seven consecutive days is used in the manufacture of carbon black, or for any other purpose, the gravamen of the offense being the excessive and unlawful quantity of gas taken and not the purpose for which it may be used.

We have already held that the provisions of Act 252 of 1924 apply to defendant corporation, both as to process and penalty, and now hold that the provision as to gas taken from the Parks No. 2 well, during the seven consecutive days' period also is applicable to said defendant, which has been excepted from the operation of said act only as to the percentage of gas to be used and not otherwise.

Defendant corporation has been allowed by the department of conservation the full maximum percentage of 20 per cent. under Act 91 of 1922. The evidence shows that defendant company cheerfully acquiesced in this.

percentage, and was so pleased with getting a daily quota of 20 per cent. of 4,647,360 cubic feet of gas, the open-flow capacity of Parks No. 2 well, that the manager of defendant company could not even wait for the order of the department of conservation to take the gas, but proceeded at once to take it, as soon as the test was made, and the capacity of the well ascertained. The manager of defendant company admits that the well was overdrawn 44,000 cubic feet of gas, and that he had been warned by the department of conservation on several occasions against such overdrafts.

This state of facts necessarily shows that the overdraft was "willfully" made, and that the penalty of the statute was justly incurred. Section 8, Act 252 of 1924.

It was not necessary, therefore, that the trial judge should charge himself that, in order to support a conviction in this case, the state must prove that the gas drawn from defendant company's well, Parks No. 2, was used in the manufacture of "carbon black."

Nor was it necessary for the trial judge to hold that the state must prove that the commissioner of conservation had fixed and determined on October 1, 1922, and semiannually thereafter, under Act 91 of 1922, what consumption of natural gas produced by each well might be used, when such well is shown to have been drilled prior to June 24, 1924, for the simple reason that it is provided in section 2, subd. 29, of Act 252 of 1924, that:

"The commissioner of conservation shall make, or cause to be made, a test of the open flow capacity of each producing well once every twelve months."

The evidence shows that the test of Parks well No. 2 was made October 7, 1924, and the open-flow capacity of the well fixed at 4,647,360 cubic feet of gas. Defendant company is prosecuted for an overdraft of this well between the dates of November 13 and 20, 1924. The law was complied with as to the time of making the test.

Nor was it necessary for the state to have proven, to support a conviction herein, that more than 1,000,000 cubic feet of gas per day was drawn from the Parks well No. 2, nor any of the other contentions of defendant company as to the quantity of gas, based upon the provisions of Act 252 of 1924, for the plain reason that such provisions have no applicability to defendant company, which is expressly excepted therefrom and restricted to the percentage which may be used under Act 91 of 1922, by section 5 of Act 252 of 1924. Defendant company has so alleged in its pleading in this case, and has fully acquiesced in the 20 per cent. of the open-flow capacity of its well, as fixed by the department of conservation at a daily quota of 929,472, or 20 per cent. of 4,647,360 cubic feet of gas, the open-flow capacity of said well.

Defendant company can find no satisfaction in the fact that, in fixing its percentage of gas, the supervisor of minerals division, through error, stated in his letter to said company of date November 12, 1924:

"For wells whose quotas figure less than 1,000,000 cubic feet per day, such wells will be allowed to take 1,000,000 cubic feet, or whatever lesser amount that can be taken while holding a working pressure equal to one-half of the closed pressure, the working pressure in no case to be below 200 pounds per square inch." Tr. 38, 39, 84.

Defendant company was fully aware, even before the order of the department of conservation was issued, that the daily quota for its Parks well No. 2 was 929,472 cubic feet of gas. Defendant was also fully advised to the same effect in the letter of November 12, 1924, and was notified in a circular issued two days afterwards by the supervisor of minerals division of the error made as to the daily quota of 1,000,000 cubic feet.

The lawful daily quota of 929,472 cubic feet was not to take effect until November 20, 1924, and said company was notified, therefore, as to the error as to the 1,000,000 cubic feet quota, in ample time before the order of

the department of conservation went into effect.

As a matter of fact, defendant company made no mistake as to the quantity of gas that it could lawfully draw from its well, under the order of the department of conservation.

10. Defendant company contends that the department of conservation cannot secure any conviction in this case, because it has never adopted and promulgated, in accordance with the requirements of law, any rule or regulation, under the authority of the provisions of Act 91 of 1922, prescribing the percentage of the open-flow capacity of gas wells which may be withdrawn therefrom.

Rule 43 of the department of conservation fixing the percentage of gas which may be used under Act 91 of 1922 in the manufacture of carbon black at 20 per cent. of the daily natural flow of the well is found at pages 37 and 38 of the transcript. This rule was adopted October 1, 1922, to become effective November 15, 1922, under the provisions of Act 91 of 1922.

While it is stated in section 5 of said act that the commissioner of conservation is authorized and empowered and directed to make, adopt, and promulgate orders, rules, and regulations which in his judgment may be necessary for the proper carrying out of the provisions of this act, there is no provision in said act requiring any particular method of such promulgation. It was left by the Legislature to the discretion of the conservation department as to the manner in which it would promulgate its rules and regulations.

These rules are usually published in booklets and distributed to owners of gas wells and the public generally.

Defendant corporation's Parks No. 2 well is rated as an "old well" in the order of the department of conservation in this case fixing the open-flow capacity of this well and its daily quota based upon 20 per cent. of the capacity. Defendant company received this order as its authority for taking gas from its well; in fact, took the gas as soon as the well was tested and its capacity was ascertained, and before the order was issued. Necessarily, defendant corporation, being engaged in operating old gas wells, must be presumed to have notice of the rules and regulations adopted by the department of conservation fixing the percentage of gas to be used from such wells. It had special notice of the order in this case fixing that percentage, and, moreover, acquiesced therein.

11. The motion in arrest of judgment filed in the case is but a repetition of the matters set out in the motion to quash and in the exception to the service of citation and process. It is stated in said exception, however, that a copy of the bill of information herein and citation were served on defendant corporation in the parish of Ouachita by the sheriff of Union parish, beyond the confines of his territorial jurisdiction and without authority of law. We find no citation in the record, and consequently, no proof of the matter complained of, by defendant corporation.

12. The motion for new trial is based largely upon the contention that the state has failed to make out the case by sufficient proof. In the face of the admission made by the manager of defendant company that it overdrew 44,000 cubic feet of gas under the new test of open-flow capacity of Parks well No. 2, made by the department of conservation on October 7, 1924, the contention of defendant company does not seem to be well founded.

It was not necessary for the state to prove that defendant company had drawn in excess of 1,000,000 cubic feet of gas per day, as permitted by section 3 of Act 252 of 1924, as the percentage of said well is not controlled by that section, but by section 5 of said act limiting said well to the percentage fixed in Act 91 of 1922, as the well was drilled prior to June 24, 1924, and prior to the passage of said act.

Nor was it necessary for the state to prove that the gas drawn was used in the manufacture of "carbon black," for the reasons already assigned.

We agree with the trial judge that the evidence shows that the overdraft of gas was "willful" in this case, and was made after previous warning as to other overdrafts.

It is conceded that section 8 of Act 252 of 1924 applies only to any person, partnership, firm, corporation, or association of persons "willfully" violating the provisions of said section.

The complaint made in the motion for new trial as to the process used in this case has already been passed upon.

It is therefore ordered that the conviction and sentence appealed from be affirmed.

ST. PAUL, J., dissents.

O'NIELL, C. J. (dissenting). My opinion is that the proviso in section 3 of the Act 252 of 1924, allowing wells theretofore drilled or commenced before the 24th of June of that year to produce the same proportion of the open-flow capacity that they were allowed to produce under the Act 91 of 1922, was intended merely to reserve to such wells the production allowed them by the Act 91 of 1922, where it would otherwise have been reduced by the Act of 1924, and did not withhold from them the privilege granted by the tenth paragraph of section 3 of the Act of 1924, of producing 1,000,000 cubic feet under a working pressure exceeding half of the closed pressure and exceeding 200 pounds per square inch when the proportions allowed in the preceding paragraphs of section 3 of the Act of 1924 would otherwise have reduced the allowance of such wells below 1,000,000 cubic feet.

I respectfully dissent from the opinion and decree submitted in this case.

### On Rehearing.

ST. PAUL, J. The defendant corporation was charged with wasting natural gas contrary to law, to wit, that "during the seven-day period beginning November 13, 1924, and ending November 20, 1924, * * * [the defendant] at its Parks well No. 2, having a maximum flow of gas allowed by law of 4,790,-000 cubic feet, willfully, etc [did] draw from said well during said seven-day period the sum of 6,551,000 cubic feet, an overdraft of 1,757,000 cubic feet, * * *." It was convicted, and now appeals.

Defendant has raised several issues, but since it would not be possible to state them clearly without first stating the laws applicable to the consumption of natural gas, we will first set forth those laws and thereafter proceed to consider the issues raised so far as may be necessary for the decision of this case.

### I.

Act 91 of 1922, p. 170, is entitled:

"An act to regulate and control the use of natural gas in the manufacture of carbon black, and to prescribe penalties for the violation of this act."

It provides, inter alia, that the commissioner of conservation shall fix and determine the percentage of natural gas which may be used in the manufacture of carbon black, which percentage shall be not less than 15 nor more than 20 per cent. of the potential capacity of any well. It further provides that any person, firm, association, or *corporation*, who shall violate such regulation shall be guilty of a misdemeanor, etc.; but it provides no process for bringing into court any *corporation* charged with a violation of its provisions. There are also other minor features to the act, but they are not material here.

### II.

[1] Act 252 of 1924 (page 594) is an act the purpose of which is stated in its title to be "To Conserve the Natural Gas Resources of the State of Louisiana." In addition to the object thus stated, the title to the act contains also a more or less lengthy *index* to the con-

tents thereof, not at all necessary to its validity. Cf. State v. Fobbs, 160 La. 237, 106 So. 840.

The act provides numerous regulations for the drilling and operating of gas wells (section 2). It also provides that the percentage of gas to be taken from a well *for any purpose* shall depend upon *the acreage* on which the well is drilled, that percentage being based on the open flow (potential) capacity of the well, and being as high as 24 per cent. for a well on 160 acres and as low as 7 per cent. for a well drilled on less than 5 acres; provided however, that:

"Where the percentages hereinabove provided [when] applied to any well, reduces the amount allowed below one million cubic feet, [per day] there may be taken from such well a total of one million cubic feet, provided the *back pressure* as elsewhere herein provided for, shall be maintained." Section 3.

Now the *back pressure* is provided for as follows:

"It shall be unlawful for any person, firm, corporation, or association of persons * * * to take any gas whatever from any gas well when the working pressure of such well is less than one-half the closed [back] pressure of such well, and provided that the working pressure of any well cannot be reduced below 200 pounds regardless of what the closed [back] pressure is." Section 4.

From which it is clear that *no gas at all* may be taken from a well when the closed (back) pressure falls below 200 pounds; but that as long as any gas at all may be taken from a well, then at least 1,000,000 feet may be taken therefrom (under the conditions above stated) regardless of the acreage on which the well is drilled.

### III.

All this is clear enough as to wells governed by the provisions of the Act of 1924. But the Parks well No. 2 was built before the passage of that act, and it is claimed both by the state and by the defendant that it is not governed by the provisions of that act, and both sides rely (though for widely differing purposes) upon the same proviso of the Act of 1924, to wit:

"Provided that the percentage of the open flow capacity of each well as fixed in this section, depending on location [acreage], shall not apply to any well or wells heretofore drilled, * * * [which] shall be allowed to produce the same percentage of the open flow capacity that such wells could produce under Act 91 of 1922." Section 3.

### IV.

The state relies on the first clause of said proviso, that "the percentage * * * as fixed in this section * * * shall not apply to any well or wells heretofore drilled," seeking thereby to have it declared that wells drilled before the act of 1924 are not entitled to the exemption which allows them (under the conditions hereinabove mentioned) to take at least 1,000,000 cubic feet per day, because that exemption (it is contended) applies only to the percentages "hereinabove provided"—i. e., those provided by the act of 1924.

[2-4] But this contention is unsound, for the next clause of the proviso relied upon distinctly says that such wells "shall be *allowed* to produce the same percentage of the open-flow capacity that such wells could produce under Act 91 of 1922." And the manifest purpose of this *allowance* was to secure to wells drilled prior to the act of 1924 all the advantages enjoyed under the prior act, and *not* to place upon them additional restrictions beyond those placed upon wells drilled after the act of 1924, for which there are two reasons: (1) The allowance was to inure not only to wells drilled, but also to wells drilling, and even to wells only contracted for, before the passage of the act; and it is not reasonable to suppose that the Legislature believed that a well merely contracted for would be completed under circumstances more unfavorable than if the old contract were abandoned and a new contract entered upon; and (2) the Legislature is presumed to have contemplated a constitutional rather than an unconstitutional statute; but a statute which favors already existing

establishments is reasonable and constitutional, whilst a statute which discriminates *against* such already existing establishments is unreasonable and unconstitutional. For instance, in regulating any profession or occupation, it is customary to discriminate to some degree in favor of those already engaged therein; and no one doubts that such discrimination does not deny any one the equal protection of the law. Cf. Watson v. State, 105 Md. 650, 66 A. 635; Watson v. Maryland, 218 U. S. 173, 30 S. Ct. 644, 54 L. Ed. 987.

### V.

The defendant also claims, under the foregoing proviso, that its well is not governed by the provisions of the Act of 1924, but exclusively by the Act of 1922.

Its purpose in seeking to have it declared that its well is governed exclusively by the former act is to escape the process provided in section 12 of the later act, by which *corporations* may be brought to the bar by a mere summons or citation, instead of by an impossible capias; for, as we said at the beginning, the former act provides no process for bringing to the bar any *corporation* violating its provisions.

But this contention is untenable. The act of 1924 was intended to be, and is, the paramount statute regulating the production of natural gas in this state. "This act shall be cumulative of and in addition to all the laws of this state which are not in direct conflict with the provisions hereof." Section 10. Hence all laws on the same subject-matter, and not in conflict with this act, are by this clause incorporated into this statute and made part thereof as fully as if set forth in full therein. So that Act 91 of 1922 is, as it were, a mere section of the act of 1924, just as section 33 of the Act of May 4, 1805, became merged into the Revised Statutes of 1870 by virtue of section 3990 thereof, for manifestly the crimes to be punished under (certain sections of) those Revised Statutes

162 LA.—7

are the crimes defined by the act of 1805, which must therefore be read into each several section which punishes one of those crimes.

[5] Hence the sum and substance of this case is, that there is but one statute regulating the amount of natural gas which may be taken from a well, and that statute is the Act of 1924, with a *proviso* therein incorporated to the effect that a well drilled before the passage of said act may still take *at least* the same percentage of gas as it might have taken under the Act of 1922.

### VI.

From the foregoing it follows: (1) That defendant's demurrer to the form of process issued against it under the Act of 1924, is not well founded; (2) that defendant has no interest in attacking the constitutionality of the act of 1922, since its provisions can operate only in its favor and never against it; and (3) that under the provisions of the act of 1924 defendant was entitled to take at least 1,000,000 cubic feet of gas from its Parks well No. 2, regardless both of the act of 1922 and of the acreage on which said well is drilled, if in doing so the working pressure of said well was not reduced below 200 pounds or below one-half the back pressure of said well, and if said back pressure itself remained constantly above 200 pounds.

### VII.

[6, 7] Hence: (1) The trial judge correctly overruled defendant's demurrer to the form of process; (2) the question of the constitutionality of Act 91 of 1922 is not involved, since defendant has no interest in that question; and (3) the trial judge erred when he refused to charge himself, as requested (in substance) by defendant, that defendant was entitled to take at least 1,000,000 cubic feet of gas per day from its Parks well No. 2, if in doing so the working pressure of said well was not reduced below 200 pounds or below one-half the back pressure of said well, and if

said back pressure itself remained constantly above 200 pounds.

### Decree.

For the reasons assigned, the sentence and verdict herein are reversed and set aside, and the case is now remanded for a new trial in accordance with the views hereinabove expressed. The right of the state to apply for a rehearing is reserved.

OVERTON, J., concurs in decree.

LAND, J., dissents and hands down reasons.

LAND, J. Section 3 of Act 252 of 1924, "An Act to conserve the natural gas resources of the state of Louisiana," provides that:

"The percentage of the open-flow capacity that gas wells may be allowed to produce or that may be drawn from each gas well shall depend upon the acreage upon which the well is drilled."

A schedule of percentages is fixed in this section of the act ranging from 24 per cent. of the open-flow capacity of a well drilled on a tract of 160 acres or more to less than 7 per cent. of the open-flow capacity of a well drilled on a 5-acre tract.

It is declared in this section that, "Where the percentages hereinabove provided applied to any well reduces the amount allowed below one million cubic feet, there may be taken from such well a total of one million cubic feet, provided the back pressure, as elsewhere herein provided for, shall be maintained"—i. e., "provided that the working pressure of any well cannot be reduced below 200 pounds regardless of what the closed pressure is." Paragraph 2, § 4, Act 252 of 1924, p. 657.

It is expressly provided in section 3 of said act:

"That the percentage of the open-flow capacity of each well as fixed in this section depending on location, shall not apply to any well or wells heretofore drilled."

It is conceded that defendant company's well was completed before the passage of Act 252 of 1924. The testimony in the case shows that at no time have the acreage percentages fixed by the act of 1924 been applied to the well of defendant company, which has been operated all the time under the percentages of Act 91 of 1922 of not less than 15 nor more than 20 per cent. of the open-flow capacity of the well.

It is not possible to apply the acreage percentages of Act 252 of 1924 to any well that has been drilled prior to the adoption of that act. As defendant company's well is not one that has been reduced by the application of the acreage percentages of Act 252 of 1924, this company is clearly debarred from claiming under that act the benefit of the million cubic feet of gas, which it claims in the present prosecution. If it were necessary to make the case plainer, a mere citation of section 5 of Act 252 of 1924 is all that is needed. Section 5 of the act of 1924 provides in clear and unmistakable terms that:

"The commissioner of conservation may grant permits for the building of plants to burn natural gas into carbon black under the conditions and provisions of Act No. 91 of 1922, except that the percentage of the open-flow capacity of gas wells that may be utilized in burning carbon black shall be controlled by this act [Act 252 of 1924], when the production of such well is controlled by this act [Act 252 of 1924], and by Act 91 of 1922 when the percentage that such wells may produce is controlled by said Act 91 of 1922."

Section 2 of Act 91 of 1922 declares:

"That the commissioner of conservation is authorized, directed, and empowered to fix and determine on the 1st day of October, 1922, and semiannually thereafter, what percentage of consumption of natural gas produced by each gas well may be used in the manufacture of carbon black, said percentage of consumption to be based upon the potential capacity of such gas well, and which percentage shall not be less than fifteen per cent. and not more than twenty per cent. of the potential capacity of such well, provided that in fixing such basis of consumption the same rule, as far as possible, shall be applied to all gas wells in any produc-

ing gas area, and provided further, that the percentage of consumption may be increased in any particular well when the safety of such well may demand such increase."

It is manifest that it is only where the acreage percentages provided for in Act 252 of 1924 are applied to wells drilled under that act and reduce the amount allowed below 1,000,000 cubic feet that there may be taken from such wells a total of 1,000,000 cubic feet, provided the back or working pressure of any well is not reduced below 200 pounds regardless of what the closed pressure is.

Section 3 of Act 252 of 1924 has expressly so declared, and the language of this section cannot be construed logically into meaning that this million cubic feet of gas may be allowed when the percentages provided for in Act 91 of 1922 are applied to wells drilled under that act, as under section 2 of Act 91 of 1922 the increase in any particular well may be made only when the safety of such well demands it. It cannot be seriously argued that section 2 of Act 91 of 1922 has been repealed by Act 252 of 1924, when this section as to percentages has been written into section 5 of the Act of 1924 and thereby retained in the later act.

It is clear that there can be no practical classification whatever under the police power of the state based upon mere capacity of gas wells, as this varies in each well when brought in, as well as at different periods of production in the same well. Necessarily, a fixed percentage of the capacity of each well must be made the basis of regulation as to the quantity to be taken.

This is what the Legislature has done under Act 91 of 1922 and Act 252 of 1924.

The percentage of gas to be pulled under Act 91 of 1922 is fixed at not less than 15 per cent. nor more than 20 per cent. of the potential, or open flow, capacity of the well; and an increase is allowed under that act only when the safety of the well requires it.

Under Act 252 of 1924 an entirely different basis of percentage is adopted, as it is predicated upon acreage, or proportionate ownership of the surface, as to all new wells to be drilled under that act. It is therefore impossible to substitute the percentages of production provided for in Act 91 of 1922 for those provided for in Act 252 of 1924.

It is plain that the owner of a 5-acre tract, or less, may exhaust the gas under an adjoining tract of 160 acres or more. The right of the owner of a small tract to take gas from the common reservoir would be, therefore, out of all proportion to the extent of his ownership, unless restricted.

That acreage, or proportionate ownership of the surface, is a fair and reasonable basis for the computation of the percentage of gas to be taken must be admitted.

Under section 3 of Act 252 of 1924 the owners of 5, 10, 20, 40, 80, and 160 acre tracts are entitled respectively to 9, 12, 15, 18, 21, and 24 per cent. of the open-flow capacity of the well. Ownership of the surface is based under the act upon governmental subdivisions of a section of land and parts thereof. Thus far it is seen that there is no discrimination between members of the same class as to percentage, whether they be owners of old wells under Act 91 of 1922, or owners of new wells under Act 252 of 1924.

The equal protection clause of the Fourteenth Amendment does not take from the state the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary. Lindsley v.

Natural Carbonic Gas Co., 220 U. S. 78, 31 S. Ct. 337, 55 L. Ed. 369, Ann. Cas. 1912C, 160; State v. City of New Orleans, 154 La. 271, 97 So. 440, 33 A. L. R. 260.

This burden has not been discharged by defendant company in the case at bar. Defendant company's well was drilled prior to Act 252 of 1924, and is classified as an old well by the state conservation department.

It must be assumed that the Legislature was aware of the average capacity of old gas wells at the time of the passage of Act 252 of 1924. A most natural and excellent reason for excluding such wells from the provision in section 3 of that act as to the 1,000,000 cubic feet is that such provision would not be applicable, as a general rule or regulation, to old gas wells, because of diminution of production caused by long operation.

The impracticability, if not impossibility, of adjusting old gas wells to the same condition as that of new wells is apparent, and must have been well known to the General Assembly of this state at the date of the adoption of Act 252 of 1924. Assuming that the Legislature acted with full knowledge as to the average condition of the production of old gas wells, and for this reason, among others, did not include these wells within the provision in section 3 of Act 252 of 1924 as to 1,000,000 cubic feet of gas, it is unimportant that the old well of defendant company may prove to be an exception in the matter of production, and may be capable of producing 1,000,000 cubic feet of gas, without reducing the back or working pressure of the well below 200 pounds, as the classification made in section 5 of Act 252 of 1924 of old wells and new wells rests upon a reasonable basis, and is not essentially an arbitrary discrimination against defendant company, a member of the old well class. Due process of law and equal protection of the laws are had when laws affect alike all persons similarly situated.

For these reasons, I respectfully dissent from the opinion of the majority of the court as to the holding that defendant company is entitled to claim the 1,000,000 cubic feet of gas in this case, and therefore is not guilty of violating Act 252 of 1924, because said company did not overpull its well to that extent.

I adhere, therefore, to our original decree affirming the conviction of defendant company in the lower court.