O’NIELL, Chief Justice.
 

 This suit was brought to have the conservation statute, Act. No. 157 of 1940, declared unconstitutional, and to annul an order of the Commissioner of Conservation, called Order 28-B.
 

 Act No. 157 of 1940 is the statute which,. in a very thorough and comprehensive way, regulates the conservation of the oil and gas resources of the state. Order 28-B was issued by the Commissioner on October 16, 1941, under the provisions of sec
 
 *104
 
 tions 8(b) and 9(a) of Act No. 157 of 1940, to regulate the production of gas from what is called the Jeter zone, in the Logansport gas field, in'De Soto Parish. The suit was brought by the Hunter Company, Inc., and the Superior Oil Corporation, each owning oil and gas leases in the Logansport field. Their complaint had reference specifically to the establishing of compulsory drilling units in the gas field. The plaintiffs asked for an injunction to prevent the Commissioner of Conservation from putting Order 28-B into effect. When the case came on for trial, and before any evidence was offered, the Superior Oil Corporation moved for and was granted a- voluntary nonsuit, on the ground that the corporation had disposed of its interest in the matter. Thereafter the Southern Production Company, Inc., owning acreage in the area to be affected by Order 28-B, intervened in the suit, on the side of the Commissioner of Conservation, in defense of the constitutionality of Act No. 157 of 1940 and of.the constitutionality and legality of Order 28-B. After hearing the evidence the judge gave judgment for the Hunter Company, granting the writ of injunction and declaring Act No. 157 of 1940 unconstitutional, and annulling Order 28-B. The Commissioner of Conservation and the Southern Production Company are appealing from the decision.
 

 The Hunter Company drilled the first well to produce gas from what is called the Jeter zone, in the Logansport field. The well is on a 190-acre lease owned by the Hunter Company. The well was completed on June 1, 1938, costing approximately $44,000. Thereafter the company constructed its own pipe line, at a
 
 exist
 
 of $12,380.16, to a line owned by the United Gas Pipe Line Company, and commenced delivering gas to that company on Decern-' ber 12, 1940. Meanwhile the Southern Production Company had acquired extensive leases in the Logansport field and drilled several producing gas wells in the Jeter zone, from which the company transported gas through its own pipe line to industrial and domestic markets in the southeastern states, as far east as Alabama. According to the evidence adduced at the , hearings before the Commissioner, and the evidence heard on the trial of this suit, the Jeter zone in the Logansport field is found at a depth ranging from 4450 to 4650 feet; the field has an area of approximately 17,000 acres — possibly 25,000 acres, about 40 per cent of the field being on the Texas side and about 60 per cent on the Louisiana side of the Sabine River.
 

 Order 28-B was issued after the holding of several protracted hearings on the subject, and the taking of the testimony of several geologists and other experts, including the state geologist. These hearings were held after due publication of the notices required by the statute, and were attended by the attorneys representing the Hunter Company and by attorneys and experts representing all parties having an interest in the proposed order. The result of the hearings and investigations was that a drilling unit of 320 acres was established by the Order 28-B, with the requirement that the locations of the wells should be approximately in the center of each 320-acre drilling unit. -
 

 
 *106
 
 It appears that an order similar to .Order 28-B, and called Order No. 28, was adopted and promulgated on June 27, 1941, by the officer whose official title was then Director of the Department of Minerals, and is now Commissioner of Conservation. For reasons which are not relevant to any question in this case the Order No. 28 was rescinded, and, with some minor changes, the new order, called Order 28-B, was substituted.
 

 The Order 28-B was issued and promulgated in conformity with the provisions of Section 8(b) and Section 9(a) of Act No. 157 of 1940. The most thorough investigation that science afforded was had for the purpose of establishing a correct drilling unit, by determining the maximum area which might be drained efficiently and economically by one well, as required by Section 8(b) of the statute.
 

 The contention of the Hunter Company is that the company should be permitted to produce from its well on the 190-acre lease the allowable measured according to the provisions of section 3 of Act No. 252 of 1924, and that so far as Order 28-B requires the company to pool or unitize the 190-acre lease with sufficient acreage to conform with the 320-acre unit, the order is unconstitutional.
 

 Section 8(b) of Act No. 157 of 1940 provides: “For the prevention of waste and to avoid the drilling of unnecessary wells, the Commissioner shall establish a drilling unit or units for each pool, except in those pools which, prior to the effective date of this Act, haye been developed to an extent and where conditions are such that it would be impracticable or unreasonable to use a drilling unit at the present stage of development. A drilling unit, as contemplated herein, means the maximum area which may be efficiently and economically drained by one well, and such unit shall constitute a developed area as long as a well is located thereon which is capable of producing oil or gas in paying quantities.”
 

 Section 9(a) of the statute provides: “When two or more separately owned tracts of land are embraced within a drilling unit which has been established by the Commissioner as provided for in Section 8 (b), the owners thereof may validly agree to pool their interests and to develop their lands as a drilling unit. Where, however, such owners have not agreed to pool their interests, the Commissioner shall, if found by him to be necessary for the prevention of waste or to avoid the drilling of unnecessary wells, require such owners to do so and to develop their lands as a drilling unit. All orders requiring such pooling shall be made after notice and hearing, and shall be upon terms and conditions that are just and reasonable, and will afford to the owner of each tract the opportunity to recover or receive his just and equitable share of the oil and gas in the pool without unnecessary expense, and will prevent or minimize reasonable avoidable drainage from each developed tract which is not equalized 'by counter drainage. The portion of the production allocated to the owner of each tract included in a drilling unit formed by a pooling order shall, when produced, be considered as if it had been produced from such tract by a well drilled
 
 *108
 
 thereon. In the event such pooling is required, the cost of development and operation of the pooled unit chargeable by the operator to the other interested owner or owners shall be limited to the actual expenditures required for such purpose, not in excess of what are reasonable, including a reasonable charge for supervision. In the event of any dispute relative to such costs, the Commissioner shall determine the proper costs, after due notice to all interested parties and hearing thereon.”
 

 The term “waste” is defined in Section 2(a) of the statute, as having, besides its ordinary meaning, the meaning “physical waste”, as that term is generally understood in the oil and gas industry;, and the meaning is said to include the inefficient, excessive or improper use or dissipation of reservoir energy, “and the location, •spacing, drilling, equipping, operating or producing of any oil or gas well or wells in a manner which results, or tends to result, in reducing the quantity of oil or gas ultimately recoverable from any pool in this state.”
 

 In the judgment appealed from, the grounds on which Act No. 157 of 1940 is declared unconstitutional are stated in four paragraphs; but in reality there are only two reasons given by the trial judge for finding the act unconstitutional. The first reason is said to be that by Act No. 157 of 1940 the Legislature has attempted to delegate to the Commissioner of Conservation the legislative power to adopt rules and regulations pertaining to drilling units, without a definite pattern or plan being first adopted and established by the Legislature. The other reason for the judge’s finding that Act No. 157 of 1940 is unconstitutional is said to be that, by attempting to authorize the Commissioner 'to compel the pooling of the interests of two or more landowners or leaseholders into a drilling unit, the act attempts to deprive the landowner or leaseholder of his property without due process of law, especially where he has drilled a producing well and has established a market for the gas which is being produced from the well.
 

 The objection that the statute is an attempt to delegate legislative power to the Commissioner of Conservation is answered by the provisions in the Constitution of Louisiana of 1921 placing the conservation of the natural resources of the state under the control of a commission or commissioner, and virtually directing the Legislature to invest the commissioner with authority to establish rules and regulations for the conservation ■ of the natural resources of the state. It is so expressed plainly in section 1 of article 6 of the Constitution, thus: "The natural resources of the State shall be protected, conserved and replenished; and for that purpose shall be placed under a Department of Conservation, which is hereby created and established. The Department of Conservation shall be directed and controlled by a 'Commissioner of Conservation to be appointed as elsewhere provided in this Constitution,
 
 who shall have and exercise such authority and power as may be prescribed by law.
 
 The Legislature shall enact all laws necessary to protect, conserve and
 
 *110
 
 replenish the natural resources of the State, and to prohibit and prevent the waste or any wasteful use thereof.” [Italics ours.]
 

 This declaration, that the Commissioner of Conservation “shall have and exercise such authority and power as may be prescribed by law” for the conservation of the natural resources, which he shall direct and control, must prevail over any general objection to the delegation of rule-making powers to a fact-finding commission or commissioner. The objection that the statute in question is an attempt to delegate legislative powers to the Commissioner of Conservation was made in State v. Guidry, 142 La. 422, 76 So. 843, with regard to the then prevailing conservation law, Act No. 54 of 1914, and was answered (loc. cit. 142 La. 432, 76 So. 846), thus: “The fifth ground on which the constitutionality of the statute is questioned is that it attempts to
 
 delegate legislative authority to the conservation commission,
 
 in violation of articles 16 and 17 of the Constitution. This objection refers to the authority conferred upon the commission to ascertain and determine, as a matter of fact, whether any particular area does or does not contain a natural oyster reef, as defined in the statute. To ascertain and determine such facts is not a legislative function.
 
 The authority of the Legislature to delegate to the administrative boards and agencies of the state the pozver and authority of ascertaining and determining the facts upon zahich the laws are to be applied and enforced cannot be seriously disputed.
 
 See Black’s Const. Law, p. 96.” [Italics ours.]
 

 The attack made in this case upon the constitutionality of Act No. 157 of 1940 was made also by the defendant in the case of State v. Carson Carbon Co., 162 La. 781, 111 So. 162, with regard to Act No. 91 of 1922, regulating and limiting the use of natural gas in the manufacture of carbon black. The court answered the defendant’s complaint (loc. cit. 162 La. 790, 791, 111 So. 165, 166) thus: “The ninth complaint is a plea that the Act 91 of 1922 is unconstitutional, in that, in so far as it undertakes to authorize, direct, and empower the commissioner of conservation to fix and determine ‘what percentage of consumption of natural gas produced by each gas well may be used in the manufacture of carbon black,’ the statute is violative of the second section of article 2 of the Constitution, forbidding any one of the three departments of the state government, or any person holding office in any one department, to exercise any power properly belonging to either of the other two departments, and is violative also of the first section of article 6 of th'e Constitution, requiring that the Legislature shall enact all laws necessary to protect, conserve, and replenish the natural resources of the state and to prohibit and prevent the waste or any wasteful use thereof. That does not mean that the Legislature may not delegate to the commissioner of conservation the authority to ascertain and determine the facts according to which the conservation laws enacted by the Legislature are to be applied and enforced. State v. Guidry, 142 La. 422, 76 So. 843.”
 

 In the case of State ex rel. Porterie, Attorney General, v. Grace, Register of the
 
 *112
 
 State Land Office, 184 La. 443, 166 So. 133, the plaintiff sued to annul certain agreements made by the Register of the State Land Office with the holder of certain mineral leases, with the approval of the Governor, under the provisions of Act No. 9 of the Extra Session of 1928. The attorney general contended that the statute was unconstitutional because it was an attempt to confer legislative and judicial powers upon the register of the state land office, and upon the Governor, to settle by agreement with the holders of mineral leases from the state all questions or controversies arising over the interpretation of such leases, and the performances of the covenants, conditions, obligations and stipulations thereof. In affirming the constitutionality of the act (184 La. 454-457, 166 So. 137-138) it was said:
 

 “In the very nature of things, the officers who are vested with the authority to make contracts of lease as the agents of the state and to exercise some discretion in fixing the terms and conditions of such contracts ought to have the authority and the necessary discretion to determine whether the terms and conditions of the contracts are complied with. The exercise of such authority is only an administrative function, and does not form part of the ‘judicial power’ referred to in the Constitution as being vested in the courts. The exercise of the authority given by Act No. 9 of the Extra Session of 1928 is subject to the ‘judicial power’ of the courts and to investigation by the courts in any instance where a party having an interest sets forth a just cause for complaint. For that reason Act No. 9 of the Extra Session of 1928 is not violative of section 1 of article
 
 7
 
 of the Constitution, investing the judicial power in the courts. * * *
 

 “The only limitation of authority in that respect is that the courts will not place their judgment above that of the executive or administrative officers who are designated by statute as the agents of the state in the determination of matters peculiarly within the knowledge of such officers, and as to which the necessary discretion is confided in them specifically by the statute which makes them the agents of the state. That does not mean that the officers so designated are invested with ‘judicial power’ in the sense in which that power is exercised by the courts. Conery v. New Orleans Water-Works Co., 41 La.Ann. 910, 7 So. 8; Holmes v. Tennessee Coal, Iron & Railroad Co., 49 La.Ann. 1465, 22 So. 403; Edison Electric Co. v. City of New Orleans, 130 La. 693, 58 So. 512; State v. Guidry, 142 La. 422, 76 So. 843. In the latter case it was said that the right of the Legislature to delegate to an administrative board or agency the authority to determine the facts upon which the law is to be applied was beyond dispute.
 

 “Inasmuch as section 1 of article 3 of the Constitution of the United States, which declares that the ‘judicial power’ shall be vested in the courts, is in language similar to that of section 1 of article 7 of the Constitution of Louisiana, the decisions of the Supreme Court of the United States are the best of authority on this subject. The question has arisen often, as to whether a statute which delegates the authority to an administrative officer or board to find
 
 *114
 
 the facts upon which the law is to be applied is a delegation of judicial power; and the question has arisen often, as it arose in State v. Guidry, supra, as to whether the delegation of such authority to an administrative officer or board is a delegation of legislative power. It is recognized consistently that a statute which delegates to an administrative officer or board or commission the authority to find the facts upon which the law is to be applied is not a delegation of either the judicial or the legislative power. Bartlett v. Kane, 16 How. 263, 57 U.S. 263, 14 L. Ed. 931; Passavant & Co. v. United States, 148 U.S. 214, 13 S.Ct. 572, 37 L.Ed. 426; United States ex rel. John Turner v. William Williams, Commissioner of Immigration, 194 U.S. 279, 24 S.Ct. 719, 48 L.Ed. 979; United States v. Ju Toy, 198 U.S. 253, 25 S.Ct. 644, 49 L.Ed. 1040; Union Bridge Co. v. United States, 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523; Oceanic Steam Navigation Co. v. Stranahan, 214 U.S. 320, 29 S. Ct. 671, 53 L.Ed. 1013; Mutual Film Corporation v. Industrial Commission, 236 U.S. 230, 35 S.Ct. 387, 59 L.Ed. 552, Ann. Cas.1916C, 296; J. W. Hampton Jr., & Co., v. United States, 276 U.S. 394, 48 S. Ct. 348, 72 L.Ed. 624 ; 6 R.C.L. §§ 174-178, pp. 174-177.”
 

 In one of the cases just cited, Union Bridge Co. v. United States, 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523, the court applied the doctrine thus: “Legislative and judicial powers are not unconstitutionally delegated to the Secretary of War by the provision of the river and harbor act of March 3, 1899, * * * § 18, empowering that official, when satisfied, after a hearing of the parties interested, that a bridge over a navigable water way of the United States is an unreasonable obstruction to navigation, to require such' changes or alterations as will render navigation reasonably safe, easy, and unobstructed.”
 

 In another of the cases cited, Mutual Film Corp. v. Industrial Commission of Ohio, 236 U.S. 230, 35 S.Ct. 387, 59 L.Ed. 552, Ann.Cas.1916C, 296, the rule was stated and applied to the facts of the case, thus : “Legislative power is not unlawfully delegated by the provisions of 103 Ohio Laws, 399, for the creation of a board of censors which is to examine and censor, as a condition precedent to exhibition, motion picture films which are to be publicly exhibited and displayed in the state, and is to pass and approve only such films as are, in its judgment, of a moral, educational, or amusing and harmless character.”
 

 In another of the cases cited, J. W. Hampton, Jr. & Co. v. United States, 276 U.S. 394, 48 S.Ct. 348, 352, 72 L.Ed. 624, the court gave this illustration of the rule: “If Congress shall lay down by legislative act an intelligent principle to which the person or body authorized to fix the rate of customs duties on imported merchandise is directed to conform, such legislative action is not a forbidden delegation of legislative power.”
 

 Referring now to the statement made in the judgment appealed from in this case that the Legislature failed to adopt a pattern or plan to control the commissioner in the establishing of drilling units, and. failed to define a “drilling unit”, the an
 
 *116
 
 swer is that the Legislature was as specific as it was possible to be in adopting the method, or the so-called pattern or plan, to be followed by the commissioner in establishing a drilling unit, and was as specific and definite as the Legislature could have been in defining a drilling unit. We quote section 8(b), thus: “For the prevention of waste and to avoid the drilling of unnecessary wells, the Commissioner shall establish a drilling unit or units for each pool, except in those pools which, prior to the effective date of this Act, have been developed to an extent and where conditions are such that it would be impracticable or unreasonable to use a drilling unit at the present stage of development.
 
 A drilling unit, as contemplated herein, means the maximum area which may be efficiently a>id economically drained by one well,
 
 and such unit shall constitute a developed area as long as a well is located thereon which is capable of producing oil or gas in paying quantities.” [Italics ours.] .
 

 As authority for our statement that the so-called pattern or plan and the definition of a “drilling unit”, in section 8(b) of the statute, are as definite as the Legislature could have made them, we refer to the decision in State v. Thrift Oil & Gas Co., 162 La. 165, 110 So. 188, 51 A.L.R. 261. The question in that case was whether Act No. 91 of 1922, which conferred upon the" Commissioner of Conservation the authority to fix the percentage of gas permitted to be used in the manufacture of carbon black, was unconstitutional for delegating to the commissioner the authority to exercise a legislative function. The court decided that the authority which the statute conferred upon the commissioner was not an unconstitutional delegation of legislative authority, and in so deciding (162 La. 171, 110 So. 190) said:
 

 “In determining the minimum and maximum limits of the percentage of gas to be used, the Legislature realized that producing wells gradually change in flow and condition, and that it was impossible, therefore, for the state to prescribe any fixed rule as a basis for a fixed percentage of the gas to be consumed.
 

 “The acts which must be performed in the conservation of the oil and gas of the state, in order to protect these natural resources against waste and wasteful use, are multitudinous.
 

 “It is not possible for the state itself to be present at each time the open flow capacity of a well is tested, in order to ascertain whether the percentage of the gas to be taken should be increased or decreased, according to the condition of the well or its production. Should the state attempt to exercise such authority, the whole time of the Legislature would be thus consumed; its acts would be endless; the thing would be utterly impracticable.”
 

 The latest decision on this subject by this court was rendered in State v. Housing Authority of New Orleans, 190 La. 710, 182 So. 725, where the court, at page 754 of 190 La., at page 739 of 182 So., quoted with approval from State v. Guidry, thus: “The authority of the Legislature to delegate to the administrative boards and agencies of the state the power and au
 
 *118
 
 thority of ascertaining and determining the facts upon which the laws are to be applied and enforced cannot be seriously disputed.”
 

 Referring to the decisions which maintain that the constitutionality of a statute like this, conferring certain authority and discretion upon a fact-finding commission or commissioner, may be saved by a provision that any person having cause to complain of any act of the commission or commissioner shall have the right to resort to the courts, we observe that in section 11 Act No. 157 of 1940 provides that any interested party adversely affected by any rule, regulation or order made by the Commissioner of Conservation under authority of the act may resort to the Courts and obtain relief by injunction against the commissioner. It is provided also that such suits shall be tried summarily. And in section 14 of the act it is provided that, in any judicial proceeding brought under authority of the act for the purpose of contesting the validity of any rule, regulation or order issued under authority of the act, an appeal may be taken according to the general laws, and that such appeals shall be placed on the preference docket of the appellate court These provisions, allowing any interested person the right to a judicial review of the rules, regulations and orders of the Commission of Conservation, are sufficient protection against abuse of his discretion, and are, of themselves, according to the ruling in State ex rel. Porterie, Attorney General, v. Grace, Register of the State Land Office, sufficient to insure the statute against being adjudged violative of the due process clause, or the equal protection clause, in the Fourteenth Amendment of the Constitution of the United States.
 

 The attorneys for the Hunter Company cite, in support of their argument that Act No. 157 of 1940 is an unconstitutional delegation of legislative authority, the following cases: State v. Billot, 154 La. 402, 97 So. 589; State v. Maitrejean, 193 La. 824, 192 So. 361; and City of Baton Rouge v. Shilg, 198 La. 994, 5 So.2d 312. Those cases are easily distinguished from the present case. In the first place the defendant in each of the cases cited was convicted of a crime or misdemeanor for violating the order, rule or ordinance in question. In the Billot case the statute, which was section 4 of Act No. 204 of 1912, undertook to authorize the Commissioner of Conservation to fix the open season for killing deer and to "vary the open season to suit the conditions of the several individual parishes”. The statute therefore undertook to authorize the commissioner, virtually, to make a local law for each parish, the violation of which law would be a misdemeanor, subjecting the violator to fine or imprisonment or both fine and imprisonment. In the Maitrejean case the statute, section 3 of Act No. 195 of 1938, undertook to authorize the milk commission to make rules and regulations, the violation of, which should constitute a misdemeanor, subjecting the violator to fine or imprisonment or both fine and imprisonment. The statute did not purport to put any limitation upon the authority of the commission, or establish
 
 *120
 
 any standard to govern the commission in the adopting of rules or regulations, the violation of which would be a misdemean- or. • In the Shilg case the defendant was convicted of violating a municipal ordinance prohibiting the parking of motor vehicles in a prescribed area between the hours of 8 a.m. and 6 p.m. for a longer period than that which might be established by an order of the Chief of Police. It was held that the attempt to delegate to the Chief of Police unrestricted authority to prescribe the hours in which automobiles might be parked within the prescribed area and during the prescribed hours of the day was an attempt to invest the Chief of Police with an arbitrary authority, and was therefore violative of the equal protection clause of the Constitution of the United States. These decisions do not support the argument that the statute in this case is an unconstitutional delegation of legislative authority.
 

 Counsel for the Hunter Company cite also the case of Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446, where it was held that the legislative power was unconstitutionally delegated by the provisions of section 9(c) of Title I of the National Industrial Recovery Act of June 16, 1933, 48 Stat. at L. 195, 200, 15 U. S.C. title I, section 709(c), 15 U.S.C.A. § 709(c), authorizing the President to prohibit, under penalty of fine or imprisonment, or both, the transportation in interstate and foreign commerce of petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any state law or valid regulation or order prescribed thereunder by the duly authorized agency of a state. The reason for the decision was that the act did not define or designate the circumstances or conditions in which the transportation was to be either allowed or forbidden. In the present case section 8(b) of the statute does lay down the essential conditions and definition.
 

 We come now to the other reason given by the trial judge for declaring the provisions of sections 8(b) and 9(a) of Act No. 157 of 1940 unconstitutional; that is, that these provisions which purport to authorize the Commissioner of Conservation to compel the pooling of the interests of two or more landowners or leaseholders into a drilling unit are an attempt to authorize him to deprive a landowner or leaseholder of his property without due process of law, or to deny him the equal protection of the law, in violation of the Fourteenth Amendment of the Constitution of the United States. This objection to the statute has reference particularly to the avowed purpose of protecting not only the public welfare but also the correlative rights of the individual landowners or leaseholders. That objection was answered in the landmark case of Ohio Oil Co. v. Indiana, 177 U.S. 190, 20 S.Ct. 576, 584, 44 L.Ed. 729, where Chief Justice White, for the court, speaking of the correlative rights of the landowners or leaseholders in the gas or oil held in a natural reservoir, upheld the State’s police power to regulate such rights, thus:
 

 
 *122
 
 “On the other hand, as to gas and oil the surface proprietors within the gas field all have the right to reduce to possession the gas and oil beneath. They could not be absolutely deprived of this right which belongs to them without a taking of private property. But there is a coequal right in them all to take from a common source of supply the two substances which in the nature of things are united, though separate. It follows from the essence of their right and from the situation of the things as to which it can be exerted, that the use by one of his power to seek to convert a part of the common fund to actual possession may result in an undue proportion being attributed to one of the possessors of the right to the detriment of the others, or by waste by one or more to the annihilation of the rights of the remainder. Hence it is that the legislative power, from the peculiar nature of the right and the objects upon which it is to be exerted, can be manifested for the purpose of protecting all the collective owners, by securing a just distribution, to arise from the enjoyment, by them, of their privilege to reduce to possession, and to reach the like end by preventing waste. * * * Viewed, then, as a statute to protect or to prevent the waste of the common property of the surface owners, the law of the state of Indiana which is here attacked because it is asserted that it devested private property without due compensation, in substance, is a statute protecting private property and preventing it from being taken by one of the common owners without regard to the enjoyment of the others. Indeed, the entire argument upon which the attack on the statute must depend involves a dilemma, which is this: If the right of the collective owners of the surface to take from the common fund, and thus reduce a portion of it to possession, does not create a property interest in the common fund, then the statute does not provide for the taking of private property without compensation. If, on the other hand, there be, as a consequence of the right of the surface owners to reduce to possession, a right of property in them in and to the substances contained in the common reservoir of supply, then, as a necessary result of the right of property, its indivisible quality, and the peculiar position of the things to which it relates, there must arise the legislative power to protect the right of property from destruction. To illustrate by another form of statement the argument is this: There is property in the surface owners in the gas and oil held in the natural reservoir. Their right to take cannot be regulated without devesting them of their property without adequate compensation, in violation of the Fourteenth Amendment, and this although it be that if regulation cannot be exerted one property owner may deprive all the others of their rights, since his act in so doing will be damnum absque injuria. This is but to say that one common owner may devest all the others of their rights without wrongdoing, but the lawmaking power cannot protect all the owners in their enjoyment without violating the Constitution of the United States.”
 

 
 *124
 
 Ohio Oil Company v. Indiana was decided in 1900, and the doctrine of the decision was affirmed in 1920 in Walls v. Midland Carbon Co., 254 U.S. 300, 41 S.Ct. 118, 65 L.Ed. 276; and in 1931 in Bandini Petroleum Co. v. Superior Court, 284 U.S. 8, 52 S.Ct. 103, 76 L.Ed. 136, 78 A.L.R. 826; and in 1932 in Champlin Refining Co. v. Corporation Commission of Oklahoma, 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062, 86 A.L.R. 403.
 

 In the case of Lilly v. Conservation Commissioner of Louisiana, 29 F.Supp. 892, 897, decided in 1939, the plaintiff questioned the constitutionality of Act No. 225 of 1936, under authority of which the Conservation Commissioner had prescribed the spacing distances for oii wells in the Eola oil field. The statute made an exception where the owner or leaseholder of a small or irregular tract was unable to pool or unitize with other owners so as to comply with the requirements of the act with regard to length and width of drilling units. The plaintiff set up the same reasons for claipiing that the act was unconstitutional that are presented in this case with regard to Act No. 157 of 1940. Judge Dawkins, for the three-judge court, after quoting extensively from Ohio Oil Co. v. Indiana, answered the plaintiff’s argument thus: “It can readily be seen that, without the power to regulate or control conditions in an oil field, the temptation to acquire quick riches might easily produce an intolerable situation in drilling indiscriminately upon any size or shape of tract, sufficient to permit derrick operations, resulting in waste and exhaustion of underground energy consisting of natural gas, etc., and ultimately restricting recovery, involving useless expenditures by operators and preventing some, if not all, from recovering their investments. Such a condition, it would seem, should be subject to the police power of the State, not only to prevent waste, but to insure a fair and reasonable participation, by the surface owners in the common pool within the producing area. Especially is this true in Louisiana, where, under the settled law, differently from some other states, the .owner of the surface or holder of a mineral lease does not actually own the fugitive minerals or gas and oil, but [has] merely an exclusive right of servitude to go upon and explore for and produce the same. The ownership becomes vested only when the minerals are brought. to the surface and reduced to possession. We believe that the decision [in Ohio Oil Co. v. Indiana] quoted from above, as well as other cases unnecessary to cite, clearly sustain the power of the State to prescribe such regulations in regard to spacing of wells, manner of drilling, etc., as are reasonably necessary to distribute equitably among the surface proprietors the right to produce these minerals from a given source. We think the Act 225 of 1936 has for its purpose the accomplishment of that end.”
 

 Every question which the Hunter Company has raised in’this case, regarding the constitutionality of Act No. 157 of
 
 1940,
 
 was raised by the plaintiff in the case of Patterson v. Stanolind Oil & Gas Co., 182 Okl. 155, 77 P.2d 83, in which the plaintiff questioned the constitutionality of a compulsory Well-Spacing Act of the Legisla
 
 *126
 
 ture of Oklahoma, being chapter 59, article 1, Session Laws 1935, 52 O.S.1941, §§ 85-87, 136-138. Under authority of the act the commission established a drilling unit of 10 acres, in a proven oil field having an area of 520 acres. The 10-acre drilling unit in question in the suit was composed of 6V4 acres in which the plaintiff had a royalty interest, and 3% acres in which he had no interest. The defendant drilled a well which produced oil in paying 'quantities in the center of the 10-acre drilling unit, hut entirely on the 6]4 acres in which the plaintiff owned the royalty interest. The order of the commission establishing the drilling unit was adopted several months after the well was completed. Thereafter the defendant, Oil and Gas Company, tendered to the plaintiff, for his share of the royalty an amount representing the proportion which 6% acres bore to the whole 10 acres. The plaintiff refused the tender and sued for an amount which would represent his royalty interest in all of the oil which was producéd from the well. The district court in Tulsa County rejected the plaintiff’s demand and the Supreme Court of Oklahoma affirmed the judgment. The case was appealed to the Supreme Court of the United States, and although the appeal was dismissed for want of a substantial federal question the decision by the Supreme Court of Oklahoma was approved in every respect by the Supreme Court of the United States (305 U.S. 376, 59 S.Ct. 259, 83 L.Ed. 231), in a per curiam,-thus:
 

 “In this suit, brought to recover his share of oil royalties, the plaintiff challenged .the validity, under the contract clause and the due process and equal protection clauses of the Fourteenth Amendment of the Federal Constitution, * * * of the Well-Spacing Act of the State of Oklahoma (chap. 59, art. 1, Okla.Sess.Laws 1935, [52 O.S.1941, §§ 85-87, 136-138]) and an order made thereunder by the Corporation Commission of that State. The Supreme Court of the State, affirming the judgment of the District Court with a modification immaterial here, sustained the validity 6f the statute and order. 182 Old. 155, 77 P.2d 83. The plaintiff brings this appeal.
 

 “The Corporation Commission fixed the boundaries of the common source of oil supply in the North Wellston area in Lincoln County, Oklahoma, so as to include 520 acres and authorized ten-acre well-spacing units within that area. -The well in question is in the approximate center of one of these ten-acre units. That unit-consists of 6% acres which lie in tract ‘A’ and 3% acres in tract ‘B’, these tracts being in separate ownership. The well is located on tract ‘A’. The statute (sec. 4(c) * * *) provides:
 

 “ ‘In the event a producing well, or wells, is completed upon a unit where there are two or more separately owned tracts, any royalty owner, or group of royalty owners; holding the royalty interest under a separately owned tract, ^shall share in one-eighth (%) of all the production from the well or wells drilled within the unit in the proportion that the acreage of their separately owned tract bears to the entire acreage of the unit’.
 

 
 *128
 
 “Under that provision, as construed by the state court, the owners of the mineral rights in the
 
 3%
 
 acres of the drilling unit are permitted to share with the plaintiff, and his co-owners of the mineral rights in the other
 
 6%
 
 acres of the unit, the oil and gas, produced from the well although it is located entirely upon the surface of the 6% acre tract. Plaintiff contends that this distribution among the owners of the
 
 3%
 
 acres works an unconstitutional deprivation of his property and an impairment of his contractual rights. The Corporation Commission found as follows:
 

 “ ‘That the said well as above described is located in the approximate center of a 10-acre tract of land, and that taking into consideration the depth of the well now producing in said common source of supply, the thickness, porosity, and permeability of the producing sand, the nature and character of the reservoir energy, the formations encountered in the drilling of the well, and the history and productive characteristics of wells in other common sources of supply which have similar formations, and from other geological and scientific information and data as shown by the records, the Commission finds that a well-spacing and drilling unit of 10 acres and of uniform size should be established in the said North Wellston pool; that the same would tend to effect the proper drainage of oil from said pool, and would result in uniform withdrawal and in the greatest ultimate recovery of oil, and would best conserve reservoir energy, and would protect the relative rights of the leaseholders and royalty owners in said common source of supply.’
 

 “It is admitted that the Commission made its findings and order after due hearing. The evidence underlying its findings is not in the record. Accordingly, as the state court said, it must be assumed ‘that the source of supply of the well in question is common to the land adjoining it and that said pool underlies not only the 6j4 acres of land on which the well is located but that it also extends beneath the 3% acre tract’. In that view the state court applied well settled principles in denying plaintiff’s contention under the Fourteenth Amendment (Ohio Oil Co. v. Indiana, 177 U.S. 190, 20 S.Ct. 576, 44 L.Ed. 729; Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369, Ann.Cas.1912C, 160; Walls v. Midland Carbon Co., 254 U.S. 300, 41 S.Ct. 118, 65 L.Ed. 276; Bandini Petroleum Co. v. Superior Ct., 284 U. S. 8, 52 S.Ct. 103, 76 L.Ed. 136, 78 A.L.R. 826; Champlin Refining Co. v. Corporation Commission, 286 U.S. 210, 52 S.Ct. 559, 76 L. Ed. 1062, 86 A.L.R. 403) and under the contract clause (Rast v. Van Deman & L. Co., 240 U.S. 342, 363, 36 S.Ct. 370, 376, 60 L. Ed. 679 [688, 689], L.R.A.1917A, 421, Ann. Cas.1917B, 455; Union Dry Goods Co. v. Georgia Pub. Serv. Corp., 248 U.S. 372, 376, 39 S.Ct. 117, 119, 63 L.Ed. 309 [311], 9 A.L.R. 1420 [P.U.R.1919C, 60]; Sproles v. Binford, 286 U.S. 374, 390, 391, 52 S.Ct. 581, 585, 586, 76 L.Ed. 1167 [1180, 1181] ; Stephenson v. Binford, 287 U.S. 251, 276, 53 S.Ct. 181, 188, 77 L.Ed. 288 [301], 87 A. L.R. 721; Home Bldg. & L. Ass’n v. Blaisdell, 290 U.S. 398, 435, 436, 54 S.Ct. 231,
 
 *130
 
 239, 78 L.Ed. 413 [427, 428, 88 A.L.R. 1481]). The argument, that the regulatory provisions of the statute authorizing the Commission to make its order fixing the drilling unit are void for indefiniteness, is without merit. Bandini [Petroleum Co.] v. Superior Ct. [284 U.S. 8, 52 S.Ct. 103, 76 L.Ed. 136, 78 A.L.R. 826], supra; Champlin Ref. Co. v. Corporation Commission [286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062, 86 A.L.R. 403], supra.
 

 “In the light of our previous decisions, the plaintiff has failed to raise a substantial federal question and the appeal is dismissed for the want of jurisdiction.”
 

 A remarkable case in which this court recognized the coequal rights of the landowners and leaseholders in an oil or gas field was the. case of Higgins Oil & Fuel Co. v. Guaranty Oil Co., Ltd., 145 La. 233, 82 So. 206, 212, 5 A.L.R. 411. The plaintiff in that case drilled a well on his own land and produced oil at a rate of 125 barréis a day by means of a pump. The defendant drilled a well on his land approximately 400 feet from the plaintiff’s well. The defendant’s well was a non-producer and was abandoned. Through some underground communication the well on the defendant’s land let in air which reduced the suction power of the plaintiff’s pump and thereby reduced the plaintiff’s production. It was discovered that by capping or plugging the defendant’s dry well, which could be done with very little trouble or expense, the capacity of the plaintiff’s pump was immediately restored. The defendant refused to plug or cap his well, and the plaintiff sued for a mandatory injunction to compel the defendant to close his well. The district court sustained an exception of no cause or right of action; but this court reversed the judgment, and in the course of its opinion, said: “A strikingly illustrative case is Ohio Oil Co. v. State of Indiana, 177 U.S. 190, 20 S.Ct. 576, 44 L.Ed. 729, where because an oil and gas basin is the common property of the owners of the several tracts of land above it the owner of one of the tracts was restrained from wasting the gas, even though his doing so was for the — to him — useful purpose of lifting the oil to the surface. In that case the owner, in tapping the stratum of oil and gas, and using the gas for bringing up the oil, was but exercising a right clearly and admittedly incident to his ownership, and yet he was restrained because his act was injurious to the other owners in the same oil and gas field.
 
 The rights of the several owners of the gas field are coequal; one owner cannot exercise his own- right so as to preclude his neighbor from exercising
 
 his,
 
 or so as to interfere with the neighbor
 
 [Italics ours.] -
 

 Our conclusion is that Act No. 157 of 1940 and Order 28-B issued under the provisions of the act are not unconstitutional for any of the reasons advanced by the Hunter Company or maintained by the Judge of the Civil District Court.
 

 The plaintiff’s argument that the extent to which he may produce gas from his well is governed by section 3 of Act No. 252 of 1924 is based upon his contention that that act was not repealed by Act No. 157 of 1940 so far as the provisions of the act of 1924 were not consistent with
 
 *132
 
 the provisions of the act of 1940. Act No. 252 of 1924 was an act to conserve the natural gas resources of the state to define the conditions under which natural gas could be burned into carbon black, to establish rules and regulations for the drilling of gas wells and the production of gas, to provide for spacing of gas wells and to limit the percentage allowance of the open-flow capacity of gas wells, and to give the Commissioner of Conservation authority to make rules and regulations for the conservation of the natural gas resources of the state, etc. In section 3 of the act it was declared that the percentage of the open flow capacity that gas wells might be allowed to produce, or that might be drawn from each gas well, should depend upon the acreage upon which the well was drilled; and a schedule of acreages was provided for. Act No. 253 of the same year provided for the conservation of oil and made provisions somewhat similar to those made in Act No. 252 for the conservation of gas. These acts were superseded by Act No. 225 of 1936, which provided for the conservation of the oil, gas and sulphur resources of the state. In the repealing clause of the act of 1936 it was declared that the act should be cumulative of and in addition to all laws which were not in direct conflict with the provisions of the act of 1936, and that the act should not be deemed to repeal or affect the previous acts,
 
 “except in so far as they are in conflict herewith.”
 
 Therefore, so far as the provisions of the act of 1924 were in conflict with the provisions of the act of 1936, the conflicting provisions in the act of 1924 were repealed by the act of 1936; and as to any other provisions in the act of 1924 the act of 1936 merely continued them in effect. In the repealing clause of Act No. 157 of 1940 it is declared that the act shall be cumulative of and in addition to other laws which are not in direct conflict with the act of 1940; but Acts Nos. 134 of Í924 and 225 of 1936 were expressly and in terms repealed by the act of 1940. It was provided, however, that the repeal of Act No. 225 of 1936 or of any other prior law should not affect any rules, regulations or orders theretofore made by the Commissioner of Conservation under authority of the previous laws. It is plain therefore that any provision in Act No. 252 of 1924 that might be deemed to conflict with the authority granted to the Commissioner of Conservation by Act No. 157 of 1940, to establish drilling units and to compel the landowners or leaseholders over a gas or oil reservoir to pool their interests, has been superseded by the act of 1940. It was not necessary, in order that the act of 1940 should have the effect of repealing the provisions of the act of 1924 so far as they conflicted with the provisions of the act of 1940, that the latter act should have made an “express”. repeal of the contrary provisions in the act of 1924. It is declared in article 23 of the Civil Code —and is an universal rule — that the repeal of a law may be either express or implied, —that it is express when it is declared literally in a subsequent law, — and that “It is implied when the new law contains provisions contrary to, or irreconcilable with those of the former law”.
 

 In a supplemental brief for the Hunter Company our attention is called to
 
 *134
 
 the fact that a bill was introduced in the last regular session of the Legislature, proposing to repeal Acts Nos. 252 and 253 of 1924, and to amend some of the provisions of Act No. 157 of 1940, while this suit was pending in this court. It is said that the bill passed the Senate by a vote of 21 to 12 but died on the House calendar. It is argued that one of the primary purposes of the bill was to overcome the charges in this suit of the unconstitutionality of Act No. 157 of 1940, which charges were sustained by the trial judge. It is said that the bill was introduced by the Chairman of the Conservation Commission; hence it is argued, as we understand, that the introducing of the bill was an indication that the author feared that the judgment of the civil district court, declaring the act of 1940 unconstitutional, would be affirmed by this court. Whatever apprehension the author of the bill may have had, with regard to the outcome of this suit, we do not consider that the introduction in the Senate of the bill referred to was a sufficient showing to overcome the authority on which we have based our conclusion in this case.
 

 It is said in the written opinion rendered by the trial judge in this case that there was no waste of gas or wasteful use of gas in the Logansport field and no evidence to show the necessity for the establishing of a drilling unit for the conservation of gas in that field. We quote from the judge’s opinion, thus: “Conceding for the sake of argument that Act No. 157 of 1940 is constitutional and is the law. governing the drilling for and producing of oil and gas in this State, then this court is of the opinion that Order 28-B is nevertheless null and void, as there was no evidence before the Commissioner to justify the establishment of a drilling pattern based on one well to each unit of 320 acres, to designate the acreage to be included in each unit, and to require the pooling of separately owned tracts in said drilling units, in order to conserve gas, and to prevent waste or the wasteful use of gas. As a matter of fact, this court finds that there was no waste of gas or wasteful use of gas in the Logansport Field, and no evidence to show the necessity for the conservation of gas in said field.”
 

 The findings of fact on which the Commissioner issued and promulgated Order 28-B, establishing the 320-acre drilling unit, are founded upon convincing evidence of the necessity for establishing such a unit, “for the prevention of waste and to avoid the drilling of unnecessary wells”, as stated in section 8(b) of the statute. The evidence is of a very scientific nature, consisting of the testimony of professional geologists and other trained observers, and is supported by physical facts. At the time of the trial of this case there were 10 gas wells in the Logansport field, producing gas from the Jeter Zone and having an average open-flow capacity of approximately 90,000,000 cubic feet per day. The evidence shows conclusively that the Logansport field is of a highly porous and permeable lime formation, from which one well could efficiently and economically drain and recover all of the gas from an area greatly exceeding 320 acres. The evidence leaves no doubt that the Logansport field consists of only one reservoir of gas. Notwithstanding the production of gas from
 
 *136
 
 the several wells had differed largely in quantity at the time of the trial of this case, and notwithstanding the volume of gas withdrawn from the Hunter well exceeded considerably the volume withdrawn from any other well in the field, the bottom-hole pressure in all of the wells had become equalized and uniform; which fact, according to the experts, shows that all of the gas from the several wells comes from one reservoir. The production manager for the Hunter Company, as a witness for the company, testified that notwithstanding large quantities of gas had- been produced from the Hunter well the pressure was about the same at the time of the trial of this case as it was at the beginning of the production.
 

 The fact that there may have been no waste or wasteful use of gas in the Logansport field, in the ordinary sense in which the word “waste” or the term “wasteful use” is used, is no reason why the commissioner should not have taken steps for the prevention of waste and to avoid the drilling of unnecessary wells in that field. The purpose of establishing drilling units, as expressed in section 8(b) of the statute, is not merely to stop the wasting of gas'which is already going on. The purpose is said to be to prevent waste and to avoid the drilling of unnecessary wells. It is in that sense that the word waste is defined in section 2(a) thus: “ ‘Waste/ in addition to its ordinary meaning, shall mean ‘physical waste’ as that term is generally understood .in the oil and gas industry. It shall include: (1) the inefficient, excessive or improper use or dissipation of reservoir energy; and the location, spacing, drilling, equipping, operating or producing of any oil or gas well or wells in a manner which results, or tends to result, in reducing the quantity of oil or gas ultimately recoverable from any pool in this state; and (2) * * * the producing of oil or gas from any pool in excess of transportation or marketing facilities or of reasonable market demand; and the locating, spacing, drilling, equipping, operating or producing of an oil or gas well or wells in a manner causing, or tending to cause, unnecessary or excessive surface loss or destruction of oil or gas.”
 

 The evidence in this case shows that the establishing of the 320-acre drilling unit will allow -for at least 28 wells and possibly 34 wells, according to the estimated area, on the Louisiana side of the Logansport gas field; and that that number of wells will produce many times the present market facilities and demand, or- the future facilities or demand for many years to come. The evidence shows also that if a larger number of wells were allowed to be drilled on the Louisiana side of the Logansport field they could not produce eventually more gas from the common reservoir than the volume that can be produced from the number of wells which the 320-acre drilling unit allows. It goes without saying that the drilling of more wells than are necessary to drain a gas field efficiently and economically causes waste; it is a waste of valuable material and skill and labor; a waste of gas for fuel in the drilling of the unnecessary wells; and a waste of gas in the allowing of the unnecessary wells to clean themselves out before being placed on production. One of the
 
 *138
 
 witnesses in this case testified that from 20 to 30 million feet of gas is blown into the air from every producing gas well, in allowing it to clean itself out, before it is placed on production; and another witness testified that at certain intervals during the operation of gas wells it is necessary to let them clean themselves out by blowing gas into the air. The evidence shows also, as an economic proposition, and as a general rule, that where gas wells are spaced close together they are abandoned at a higher bottom-hole pressure than they'would be if spaced further apart. When a gas well is abandoned at a high bottom-hole pressure there is a waste of the gas that is left in the ground. The witnesses in this case also called attention to the fact that the greater the number of wells the greater the danger of having a blowout, and the consequent enormous waste of gas. In the case of Marrs v. City of Oxford, 32 F.2d 134, loc. cit. 140, 67 A.L.R. 1336, the court observed that the greater the number of wells in a given area the greater would be the hazards to the public. In this connection we observe that, in section 3(f) of the statute in question in this case, one of the purposes for which the Commissioner of Conservation has authority to make rules and regulations and to issue orders is “To prevent ‘blowouts’
 

 It was suggested during the argument of this case that the establishing of the 320-acre drilling unit on the Louisiana side of the Logansport gas field might cause the landowners or leaseholders on this side of the field to obtain less than their just proportion, and permit the landowners and leaseholders on the Texas side of the field to obtain more than their just proportion of the gas in the whole reservoir, if the authorities in Texas should not adopt such a drilling unit. But it is obvious that Order 28-B establishing the 320-acre drilling unit cannot affect the quantity of gas to be taken from the Logansport field. The order affects only the production of gas from the Jeter horizon. Gas, unlike oil, cannot be stored, and cannot be transported except by pipe line; hence the quantity of gas that can be produced from a given field is limited by the pipe line outlet; and the evidence in this case shows that the 320-acre drilling unit will permit the drilling of a number of wells far in excess of the number necessary to meet the pipe line demand, or market demand, for at least IS years. Therefore, if a smaller drilling unit should be established by the Commissioner of Conservation, or if there should be no drilling unit established, the result would be merely that the same quantity of gas would be taken from a greater number of wells than the number allowed by the 320-acre drilling unit.
 

 It is stated in the opinion rendered by the trial judge in this case that any rule or regulation adopted by the Commissioner of Conservation ought to be.applied alike to all gas fields throughout the state, and that the evidence shows that no drilling unit has been established by the commissioner for any gas field except the Logansport field; hence it is stated in the opinion of the judge that the establishing of the 320-acre drilling unit in the Logansport field is arbitrary and discriminatory. The answer to this, of course, is that the conditions in the several gas fields throughout
 
 *140
 
 the state are not the same, or not alike, —as the courts have observed in the cases which we have cited. There is no arbitrary discrimination, or denial of the equal protection of the laws, when the laws are applied alike to all persons similarly situated. - In that sense the landowners and leaseholders in the various gas fields throughout the state are not similarly situated. In fact it does not appear that the plaintiffs in this suit charged that the establishing of the 320-acre drilling unit for the Logansport gas field was an arbitrary discrimination against' the landowners and leaseholders generally, in that field, and in favor of the landowners and leaseholders generally in the other gas fields throughout the state.
 

 In a supplemental brief filed for the Hunter Company after this case was re-argued and resubmitted, complaint is made that, although provision is made in section 9(a) of the statute for the Hunter Company to be reimbursed the proportionate share of the cost of drilling and operating, the Hunter well, chargeable to the other landowners or' leaseholders in the drilling unit, there is no provision made for collecting or enforcing the reimbursement. The answer to this of course is that the Hunter Company has had and will have possession of all of the proceeds from the production of the well and may retain all of the proceeds until the drilling of the well and putting it on production is entirely paid for.
 

 The judgment appealed from is set aside and the suit of the Hunter Company is dismissed and its demand is rejected at its cost.
 

 ROGERS, J., absent.