LANDRY, Judge.
Plaintiff, a member of the bar of this state, instituted this action against defendant seeking damages and attorney’s fees for the alleged breach of a contract wherein defendant engaged the services of plaintiff in the latter’s professional capacity. The trial court rejected plaintiff’s demands and plaintiff has appealed.
The single issue presented by this appeal is simply a matter of interpretation of the terms of the contract and agreement entered into by appellant and appellee. Notwithstanding there is absolutely no dispute between the litigants concerning the circumstances giving rise to the instant litigation, nevertheless, narration thereof in some detail is essential to a clear understanding of the matter to be resolved herein.
In February, 1938, defendant owned a substantial number of oil, gas and mineral leases in the Ville Platte oil field and desired to obtain voluntary pooling or uniti-zation agreements to facilitate and expedite development of its leases. At this time our legislation and jurisprudence regarding unitization was such that, for all practical purposes, pooling or unitization could be obtained only upon written consent of all mineral and royalty owners affected. Plaintiff, an attorney prominent in the Ville Platte area, was owner of extensive mineral interests in the Ville Platte field as well as being related to and acquainted with a large number of other mineral and royalty owners. Under the circumstances the defendant deemed it advisable to acquire the assistance of a local agent whose knowledge and influence would aid considerably in securing the signatures of owners to unitization agreements desired to be formed by appellee. With this object in view defendant contacted plaintiff and, after negotiation, on February 18, 1938, plaintiff and defendant entered into a formal written contract of employment wherein plaintiff, in consideration of the sum of $1,-000.00 per unit (to be paid from production on each unit), agreed to assist defendant in obtaining voluntary unitization agreements in the Ville Platte Field situated in Evangeline Parish. Said contract provided, inter alia, the following:
“Whereas, the party of the first part is desirous of procuring the execution of certain unitization contracts covering leases held by it in what is known as the Ville Platte oil field in Evangeline Parish, wherein the party of the second part is the owner of either royalty, mineral or fee interest, and whereas it is desirous of securing the assistance of party of the second part in procuring the execution of said unitization contracts by the other parties interested therein, as well as the execution thereof by said party of the second part. * * *
“For and in consideration of an oil payment hereinafter stated, party of the second part obligates himself that he will execute a unitization contract upon each of the above numbered blocks, as one of the interested parties, and in addition thereto he will use his influence in procuring the execution thereof by each of the other interested parties therein; and in case it is desired by the first party to procure contracts in the future upon any *649 block or blocks wherein the second party is the owner of either royalty, mineral or fee interests, he will likewise execute same and render such assistance as he can in procuring the execution thereof by the other interested parties, upon the same terms and conditions as hereinafter stated, with the same force and effect upon both parties as if said block were described herein.
“In consideration of the execution of said unitization contracts as above stated by the party of the second part and the assistance that he is able to render the first party in procuring the execution thereof by the other interested parties in each instance, the party of the first part agrees to pay the party of the second part an oil payment from each of said blocks or units as follows:

“This oil payment shall apply to any additional units which, in the future, party of the first part may call upon party of the second part to execute and ask for his assistance in procuring the execution thereof by other interested parties, with the same force and effect as if same were enumerated herein; provided, such units so submitted shall provide for a spacing of one well for approximately each twenty acres.
“In case the party of the first part is unable to secure the execution of the unitization contracts upon unit or units above described by all the interested parties so as to enable it to carry out the well spacing program outlined therein, then and in that event this contract shall be of no force and effect as to such unit or units by reason of the execution thereof by party of the second part.
“Each party agrees that this contract shall not be inscribed in the public records of Evangeline Parish, but the Continental Oil Company binds itself that in event of any sale or sublease of the lands included in the unit affected thereby, prior to the full payment of said $1000.00 from the oil when and as produced, it will make provision in such sale, assignment or sublease for the payment thereof to party of the second part.”
By contract subsequently confected January 18, 1941, the 1938 compact was expressly terminated and a new contract entered into between the parties wherein the $1,000.00 consideration per unit due plaintiff for services to be performed was made payable cash in advance. This latter agreement specifically contemplated formation of additional units numbered 17 to 25, inclusive, and 27 to 29, inclusive, and further stipulated:
“Whereas, Continental is holder and owner of oil, gas and mineral leases covering lands situated in the Ville Platte oil field in Evangeline Parish and desires to unitize and form portions of the lands covered by said leases into separate blocks or units for drilling purposes; and * * *
“Whereas, pursuant to the provisions of an unrecorded contract by and between the parties dated February 18th, 1938 * * *, which said contract, and the plat attached thereto, is made a part hereof by reference for all purposes; * * *.
“II.
“A. Steckler agrees that, upon presentation to him by Continental of unitization agreements forming, affecting and covering units or blocks designated as numbers seventeen (17) to twenty-five (25) inclusive, and numbers twenty-seven (27), twenty-eight (28), .and twenty-nine (29) * * * he will execute such unitization agreements as-an interested and subscribing party.
“B. Steckler further agrees that upon presentation to him by Continen *650 tal of any one or more unitization agreements, in addition to those herein-above specifically described, forming, affecting, and covering units or blocks of land in the said Ville Platte oil field for drilling purposes, in which he shall own any fee, mineral or royalty interest, he will execute the same as an interested and subscribing party.”
“III.
“For and in consideration of Steck-ler’s assistance to, and cooperation with Continental, the use of his good offices in procuring the execution of the unitization agreements, mentioned in Article II above, by all parties who shall own an interest in the lands affected thereby, and in consideration of the execution of such unitization agreements by Steckler, Continental agrees to pay him as follows:
“A. * * *
“3, * * *
“C. The sum of One Thousand Dollars ($1,000.00) cash upon the execution by Steckler, under the provisions of Article II-B hereof, of each unitization agreement forming, affecting and covering a unit not specifically designated as Article II-A above.”
Prior to execution of the 1941 agreement, the legislature adopted Act 157 of 1940, LSA-R.S. 30:2 et seq., which set up a complete and comprehensive conservation program conferring upon the Commissioner of Conservation power, inter alia, to create forced pooling of drilling units. Notwithstanding enactment of Act 157 of 1940, many operators continued to follow the practice of obtaining voluntary pooling agreements because of doubt as to the procedure and practice pursuant to Act 157 of 1940, and also because of skepticism regarding its constitutionality. It is this uncertainty regarding the efficacy of Act 157 of 1940, which led appellee to continue to resort to voluntary pooling agreements subsequent to the effective date of Act 157 of 1940, and until the Supreme Court’s rendition of decision in Hunter Company, Inc., et al. v. McHugh, 202 La. 97, 11 So.2d 495, which upheld the constitutionality of Act 157 of 1940, and specifically recognized the authority of the Commissioner of Conservation to form forced pooling of drilling and production units after hearings.
On October 28, 1943, the contract of January 18, 1941, was amended in certain particulars not germane to the controversy before the court. Pursuant to the 1941 agreement, as amended, several of the units specifically enumerated in Section II A of the contract were duly completed and plaintiff was paid the contract price of $1,000.00 for each said voluntary unit, the last unit so completed being Unit #41, for which appellant was paid the agreed consideration in November, 1943. No other units were sought or formed by appellee in the Ville Platte Field until a Field Unitization Agreement was desired in 1950. A separate contract (having no bearing on the issue before the court) was entered into between the parties wherein, for services performed in connection with the Field Unitization Agreement, appellant was paid the sum of $6,000.00 cash. Subsequent to the aforesaid Field Unitization Agreement of 1950, no new unitizations were sought by defendant in the Ville Platte Field until defendant’s application for a forced pooling of units culminated in the issuance of Order #22-B by the Department of Conservation, State of Louisiana, dated June 19, 1958, effective July 1, 1958, establishing four involuntary or forced units Numbered I through IV, respectively. Subsequently, ap-pellee, on its own application obtained from the Conservation Commission Order #22-B-2, effective March 1, 1960, creating and establishing Unit No. 5 in the Ville Platte Field. Finally, on November 21, 1960, defendant applied for the forced pooling of Units Numbers 6 and 7 in the Ville Platte Field which said units were created by decree of the Conservation Commission by *651 virtue of its order #22-B-3 made effective December 1, 1960.
It is conceded appellant was at all times ready and willing to assist and cooperate with defendant in the procuration and execution of unitization agreements as contemplated by the contract of January 18, 1941.
In essence plaintiff-appellant maintains the terms of the 1941 agreement obligated defendant to utilize plaintiff’s professional services in connection with any and all unitizations sought by defendant in the Ville Platte Field. Based on this premise esteemed counsel for appellant forcefully contends that inasmuch as the hereinabove quoted Article II B provides the contract encompasses any unitization sought by defendant “in addition to those hereinabove specifically described * * * in the Ville Platte Field”, appellant is entitled to the stipulated fee of $1,000 for each of the seven units created by the forced or involuntary pooling resulting from the aforesaid orders of the Conservation Commission establishing Units I through VII as hereinbefore shown notwithstanding appellant’s concession he neither signed said uni-tization agreements nor performed any services in connection therewith.
Succinctly stated, it is appellant’s position the contract obligated appellee to utilize his services in connection with all unitizations sought in the Ville Platte Field and appellee, in resorting to forced pooling before the Conservation Commission, abrogated and by-passed its obligation under the agreement, thereby preventing appellant from executing and performing the services for which appellee had contracted. More precisely, relying upon the provisions of LSA-R.C.C. 2040 esteemed counsel for appellant maintains plaintiff’s performance under the contract, having been prevented by the action of appellee in going before the Conservation Commission ' rather than utilizing his services to acquire the units in question, is deemed fulfilled and defendant is therefore liable for payment of the agreed contract price.
On the other hand, however, astute counsel for appellee argues the agreement does not give appellant the right to assist in the creation of all units desired by appellee but only to assist if and when a voluntary pooling agreement is presented to appellant. It is the further contention of appellee there was no obligation on its part to set up any units at all and neither was there any provision in the contract proscribing its application to the Conservation Commission for a forced unitization order once said form of unitization was authorized by law. Stated otherwise, the position of appellee is the contract obligated neither party to do any thing whatsoever until and unless appellee, in aid of obtaining voluntary owner executed unitization agreements, should present to and call upon plaintiff for his signature to such an agreement in which event it would then become appellant’s duty to assist in obtaining other required signatures thereby giving rise to the correlative obligation on the part of appellee to pay the consideration provided for in the contract.
It is conceded defendant has paid for all services actually performed by appellant pursuant to the contract and the only dispute between the parties concerns the sum of $1,000.00 per unit allegedly due appellant for each of the Commission created units.
The issue herein presented for decision must be resolved in the light of certain well established rules governing the interpretation of contracts.
When called upon to enforce or interpret a contract, the courts must seek for and ascertain the mutual intention of the parties, if that be possible. Chicago Mill & Lumber Co. v. Lewis, La.App., 68 So.2d 913; Cooley v. Meridian Lumber Co., 195 La. 631, 197 So. 255.
In the interpretation of contracts, courts are bound to give legal effect to the true meaning and intent of the parties *652 and in determining such intent all facts and circumstances relevant and pertinent are to be weighed and considered. Cardos v. Cristadoro, 228 La. 975, 84 So.2d 606.
The intention of parties to an agreement may be gathered from the words of the instrument evidencing the agreement and the manner in which it was executed, Bourg v. Hebert, 224 La. 535, 70 So.2d 116, and from other circumstances beyond the wording of the instrument. Boisseau v. Vallon & Jordano, 174 La. 492, 141 So. 38. See also LSA-C.C. Article 1950.
Our careful analysis of the terms of the agreement discloses nothing therein which obligated appellee to call upon appellant for rendition of services incident to creation of voluntary units in the field in question. Section II A of the agreement provides that with respect to the units expressly designated, namely 17 through 25, inclusive, and 27 through 29, inclusive, appellant was obligated to sign "upon presentation to him by Continental of unitization agreements forming, etc.” By the terms of II B appellant was required to execute unitization agreements with respect to units not specifically designated in the agreement but which included lands in which appellant owned a mineral interest, but again only upon presentation to him by defendant of a unitization agreement including such properties. Nothing in either paragraph unequivocally obligated defendant to unitize lands in which plaintiff owned a mineral interest; it remained defendant’s option to seek unitization of any lands situated in the field irrespective of whether plaintiff owned an interest therein and further notwithstanding the proposed unit was expressly designated in the contract.
Our appreciation of the applicable provisions is that they contemplate there shall be no obligation upon plaintiff except upon presentation to him of a voluntary unitization agreement involving lands in which he owned an interest, such presentation giving rise to his duty to sign and assist defendant in securing the signatures necessary to complete such a unit. Even a casual reading of the provisions involved indicates there was no obligation upon defendant to create any units at all and thereby give rise to a duty on its part to request plaintiff’s signature and services. As we view the agreement its enforcement was conditioned upon the decision of defendant to seek a voluntary unit and present such proposition to plaintiff thus giving rise to plaintiff’s obligation to perform and the correlative duty of defendant to reciprocate in payment for services thus rendered by plaintiff. We detect no language in the contract binding defendant to resort to voluntary unitization in each instance in which unitization was desired; neither do we note therein any provision prohibiting defendant’s invocation of involuntary or forced pooling authorized by Act 157 of 1940 which was in effect at the time of confection of the contract herein relied upon by appellant. It is conceded that although plaintiff owned an interest in each of the seven Commission pooled units, in no such instance was plaintiff called upon to sign the unitization agreement or perform any service in connection therewith.
In effect the agreement before us provided that if plaintiff were called upon to perform certain services he would do so at the unit price of $1,000.00. Until so requested by defendant he was under no obligation to perform and until he performed at appellee’s request there was no obligation on the part of appellee for the unit price stipulated. In essence plaintiff complains because he was not called upon to perform but insists upon payment for services as though he had been requested to perform. The record indicates, however, plaintiff was in fact paid the agreed contract price for all services performed at defendant’s request. Basically, defendant was obligated to pay only for services which it might call upon plaintiff to perform and this, the record shows, defendant has done.
The several authorities cited by learned counsel for plaintiff in support of the con *653 tention Article 2040 LSA-C.C. is applicable hereto, have been carefully considered and found to be inapposite to the case at bar. In each instance complainant was obligated to and was in fact performing or attempting performance of obligations assumed under the particular agreement. In the instant case, quoad the 7 units in question, plaintiff has performed no services whatsoever; th«e has been no interference with plaintiff's attempt to perform any act required under the contract and indeed there could not have existed any impediment to plaintiff's performance for the reason plaintiff was under no obligation to perform.
The reasons hereinabove set forth render unnecessary our consideration of ap-pellee’s pleas of prescription which were not passed upon by the trial court.
Affirmed.